# United States Court of Appeals
## For the First Circuit

No. 16-2066

CLEMENT C. BENENSON,

Petitioner, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellee.

No. 16-2067

JAMES BENENSON III,

Petitioner, Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellee.

APPEALS FROM THE UNITED STATES TAX COURT

[Hon. Kathleen Kerrigan, U.S. Tax Court Judge]

Before

Lynch, Stahl, and Thompson,
Circuit Judges.

Neal J. Block, with whom Robert S. Walton and Baker & Mackenzie LLP was on brief, for appellants.
Ellen Page DelSole, Attorney, Tax Division, U.S. Department of Justice, with whom David A. Hubbert, Acting Assistant Attorney

General, Tax Division; <u>Gilbert S. Rothenberg</u> and <u>Teresa E. McLaughlin</u>, Attorneys, Tax Division, U.S. Department of Justice, were on brief, for appellee.

---

April 6, 2018

---

**STAHL**, **Circuit Judge**.  Clement Benenson ("Clement") and James Benenson III ("James III") appeal from the Tax Court's ruling that they owe an excise tax for contributions made to their Roth individual retirement accounts ("Roth IRAs") in violation of contribution limits.  Using the common-law substance over form doctrine, the Commissioner of Internal Revenue recharacterized a transaction Clement and James III entered into to reduce their federal taxes, and the Tax Court affirmed.  Summa Holdings, Inc. v. Comm'r, 109 T.C.M. (CCH) 1612 (2015).  After careful consideration, we find the transaction violates neither the letter nor purpose of the relevant statutory provisions and therefore reverse the Tax Court's decision.

## I.

Summa Holdings is a C corporation and the parent of a consolidated group of manufacturing companies with export sales.[1]

---

[1] We define briefly C corporations and S corporations, as well as the attendant costs and benefits these entities had at all times relevant to this case:

> A C corporation is a corporate entity that is required to pay taxes on the income it earns. If a C corporation decides to issue dividends to its shareholders, the shareholders must pay income tax on these dividends. This arrangement exposes shareholder dividends to double taxation -- a C corporation's income is taxed at the corporate level and the portion of the C corporation's income that is passed on to shareholders is taxed again at the shareholder level. An S corporation, by contrast, is not taxed at the corporate level. Instead, the responsibility for the payment of

In 2008, Summa Holdings' largest shareholders were James Benenson, Jr. and the James Benenson III and Clement Benenson Trust ("the Trust"). James Benenson, Jr. and his wife Sharen are the trustees of the Trust and Clement and James III are the beneficiaries. This case arises from a transaction the Benensons and Summa Holdings engineered to reduce their federal taxes through the use of domestic international sales corporations ("DISCs") and Roth IRAs.

Congress created DISCs as a part of the Revenue Act of 1971, Pub. L. No. 92-178, 85 Stat. 497. A company that produces goods for export can contract to pay a DISC a commission from its export sales. The DISC pays no federal corporate income tax on these commissions. 26 U.S.C. § 991.[2]

Once a DISC receives funds from the commissions, it may, if it chooses, issue dividends to its shareholders. The DISC's shareholders "often will be the same individuals who own the export

---

taxes owed by the S corporation "passes through" to its shareholders, who pay the tax liability in proportion to each shareholder's pro rata share of the S corporation. An S corporation avoids double taxation on dividends because S-corporation income is only taxed once -- at the shareholder level.

In re Northlake Foods, Inc., 715 F.3d 1251, 1253 n.2 (11th Cir. 2013).

[2] The DISC's shareholders are taxed on any actual distributions, the interest on the DISC's deferred tax liability, 26 U.S.C. § 995(f), and a small portion of the DISC's income that is "deemed distributed" to them, 26 U.S.C. § 995(b)(1)(F)(i).

- 4 -

company."  Summa Holdings, Inc. v. Comm'r, 848 F.3d 779, 782 (6th Cir. 2017).  Thus, "the net effect of the DISC is to transfer export revenue to the export company's shareholders as a dividend without taxing it first as corporate income."  Id.

Congress created Roth IRAs as a part of the Taxpayer Relief Act of 1997, Pub. L. No. 105-34, sec. 302, 111 Stat. at 825.  Different from the rules governing traditional IRAs, contributions to a Roth IRA are not deductible, 26 U.S.C. § 408A(c)(1), but qualified distributions from the account are not taxed, 26 U.S.C. § 408A(d)(1).  Traditional and Roth IRAs are subject to the same annual contribution limits, and in 2008, these limits were set at $5,000.  26 U.S.C. §§ 219(b)(5)(A), 408A(c)(2).  If an IRA of either type exceeds the contribution limits, it is subject to a 6% tax annually on the amount of excess contributions. 26 U.S.C. § 4973(a).

In 2004, the Internal Revenue Service ("IRS") released Notice 2004-8 ("the Notice"), which described transactions some taxpayers were entering into "to avoid the statutory limits on contributions to a Roth IRA."  I.R.S. Notice 2004-8, 2004-1 C.B. 333.  The transactions described in the Notice involved a taxpayer who owned a preexisting business, a Roth IRA maintained for the taxpayer's benefit, and a corporation acquired by the Roth IRA. Id.  The corporation owned by the Roth IRA would enter into an agreement with the taxpayer's business whereby the business would

- 5 -

transfer value to the corporation. Id. The Notice described how either the Roth IRA's purchase of shares in the corporation or the transaction between the taxpayer's business and the corporation would not be "fairly valued" and would therefore have "the effect of shifting value into the Roth IRA" in excess of the contribution limits. Id. The Notice declared that the IRS intended to deny or reduce deductions made using these transactions. Id.

On January 30, 2002, James III and Clement each deposited $3,500 into individual Roth IRAs they had established a few weeks earlier. On January 31, 2002, each of the Roth IRAs paid $1,500 for 1,500 shares in JC Export, a newly formed DISC. That same day, the Roth IRAs sold their shares in JC Export to JC Export Holding ("JC Holding"), a C corporation the Benensons also formed that day. Each of the Roth IRAs received a 50% stake in JC Holding. The parties agree that JC Holding:

> was formed, in part, so that the Roth IRAs would not have unrelated business income and the associated tax reporting obligations and, in part, so that the custodians of the Roth IRAs no longer would be involved as shareholders of JC Export and, thus, would avoid being required to take shareholder actions regarding JC Export.

JC Export entered into agreements with Summa Holdings' subsidiaries to receive DISC commissions. Once JC Export received payments from Summa Holdings' subsidiaries, it immediately transferred the funds to JC Holding. After setting aside the

amount it estimated it would owe in federal income taxes, JC Holding immediately paid out the remainder of the funds to the Roth IRAs as a dividend. In 2008, JC Holding transferred $1,477,028 to the Roth IRAs. By the end of 2008, the James III Roth IRA was worth $3,145,086 and the Clement Roth IRA was worth $3,135,236.

James III and Clement have stipulated that the "sole reason for entering into the Transaction at Issue . . . was to transfer money into the Roth IRAs so that income on assets in the Roth IRAs could accumulate and be distributed on a tax-free basis." They likewise stipulated that they had no non-tax business purpose for establishing the Roth IRAs, JC Export, and JC Holding.

In 2012, the Commissioner issued a notice of deficiency for the 2008 tax year to Summa Holdings, the Trust, and James III and Clement. The Commissioner determined that the DISC commissions paid to JC Export were not, in substance, DISC commissions; they were in fact dividends to Summa Holdings' shareholders. The Commissioner viewed the resulting payments from JC Holding to the Roth IRAs not as dividends, but as contributions to the Roth IRAs in excess of the contribution limits.

The Tax Court affirmed the Commissioner's determination. Summa Holdings, Inc. v. Comm'r, 109 T.C.M. (CCH) 1612 (2015). The Tax Court found it was appropriate for the Commissioner to recharacterize the transaction under the substance over form

doctrine because the transaction's sole purpose was to "shift[] millions of dollars into Roth IRAs in violation of the statutory contribution limits." Id. at *20.

Summa Holdings appealed to the Sixth Circuit, which reversed the Tax Court's decision. Summa Holdings, 848 F.3d at 782. The Sixth Circuit found the Commissioner "had no basis for recharacterizing the transactions" because the taxpayers had "used the DISC and Roth IRAs for their congressionally sanctioned purposes -- tax avoidance." Id.

As Massachusetts residents, James III and Clement appeal the Tax Court's decision to this court. James Jr. and Sharen's appeal is pending before the Second Circuit.

## II.

Before discussing the merits of their appeal, the Benensons contend that the Sixth Circuit's ruling in Summa Holdings prevents us from making an independent determination of the issues in this case, invoking the principles of claim preclusion, issue preclusion, and comity. We find otherwise.

A.   Claim Preclusion

"[T]he essential elements of claim preclusion are (1) a final judgment on the merits in an earlier action; (2) an identity of the cause of action in both the earlier and later suits; and (3) an identity of parties or privies in the two suits." Kale v. Combined Ins. Co. of Am., 924 F.2d 1161, 1165 (1st Cir. 1991)

(citations omitted).  The Sixth Circuit's decision was a final judgment on the merits, but the second requirement for claim preclusion is missing.

Each tax year is a different cause of action even when the transaction being disputed and taxpayer is the same.  Comm'r v. Sunnen, 333 U.S. 591, 598 (1948).  Different tax liabilities owed by different taxpayers present different causes of action, even where the liabilities arise from the same transaction.  See Batchelor-Robjohns v. United States, 788 F.3d 1280, 1286-91 (11th Cir. 2015).  Here, claim preclusion does not apply because we are determining whether James III and Clement owe excise tax liabilities for the year 2008, not whether Summa Holdings owes a corporate tax liability for that year.

B.   Issue Preclusion

James III and Clement argue that because the Sixth Circuit decided that the DISC commission was a deductible expense, that there was no constructive dividend, and that there were no excess contributions to their Roth IRAs, the Commissioner is precluded from relitigating these issues in this court.  As discussed above, the parties here are different from the parties in Summa Holdings.  Generally, offensive issue preclusion cannot apply against the government unless the parties to the litigation are the same.  United States v. Mendoza, 464 U.S. 154, 162-63 (1984); United States v. Plat 20, Lot 17, 960 F.2d 200, 211 (1st

Cir. 1992). James III and Clement claim they are in privity with Summa Holdings and seek to introduce evidence regarding a 2012 share transfer whereby James III and Clement became the controlling shareholders of Summa Holdings. Because the 2012 transfer was not submitted to the Tax Court, we will not consider it. Based on the record established below, James III and Clement cannot show that they are in privity with Summa Holdings.

C.   Comity

Finally, comity does not force us to follow the Sixth Circuit. "Comity is not a rule of law, but one of practice, convenience, and expediency." Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 488 (1900). A circuit need not follow other circuits' decisions where "there appear cogent reasons for rejecting them." Popov v. Comm'r, 246 F.3d 1190, 1195 (9th Cir. 2001) (quoting Unger v. Comm'r, 936 F.2d 1316, 1320 (D.C. Cir. 1991)). Of course, we will give the Sixth Circuit's decision "the same respectful consideration that we would always accord to sister circuits faced with an identical or similar case." Kanter v. Comm'r, 590 F.3d 410, 420 (7th Cir. 2009).

**III.**

We review the Tax Court's decision "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." I.R.C. § 7482(a)(1). We review the Tax Court's legal interpretations de novo. Capital Video Corp.

- 10 -

v. Comm'r, 311 F.3d 458, 463 (1st Cir. 2002). "The general characterization of a transaction for tax purposes is a question of law subject to review." Santander Holdings USA, Inc. v. United States, 844 F.3d 15, 23 (1st Cir. 2016) (quoting Frank Lyon Co. v. United States, 435 U.S. 561, 581 n.16 (1978)).

The federal tax system "is, and always has been, based on statute." Id. at 21. "[L]ike other common law tax doctrines," the substance over form doctrine[3] "can thus perhaps best be thought of as a tool of statutory interpretation." Id. Viewed in this manner, the substance over form doctrine does not "tak[e] a transaction entirely outside its statutory framework," but instead "helps courts read tax statutes in a way that makes their technical language conform more precisely with Congressional intent." Dewees v. Comm'r, 870 F.2d 21, 35 (1st Cir. 1989) (Breyer, J.).

---

[3] We will use the term "substance over form doctrine" as the parties have, both below at the Tax Court and in their briefing to us, although we note that "it might be more apt to say that substance over form serves as a background principle, supporting a group of related doctrines." Linda D. Jellum, Codifying and "Miscodifying" Judicial Anti-Abuse Tax Doctrines, 33 VA. TAX REV. 579, 595 (2014); see also Santander, 844 F.3d at 19 n.3 (discussing "two 'substance over form' doctrines, the 'step transaction' and 'conduit' doctrines") (emphasis added). This case does not involve the "economic substance" doctrine, which also grew out of the Supreme Court's decision in Gregory v. Helvering, 293 U.S. 465 (1935), but which focuses more specifically on examining whether a transaction had "no business purpose or economic substance beyond tax evasion." Santander, 844 F.3d at 23 (quoting Schussel v. Werfel, 758 F.3d 82, 97 (1st Cir. 2014)); see also 26 U.S.C. § 7701(o).

Under the substance over form doctrine, the taxpayer's transaction "must be viewed as a whole," Comm'r v. Court Holding Co., 324 U.S. 331, 334 (1945), to determine whether "the transaction upon its face lies outside the plain intent of the statute." Gregory v. Helvering, 293 U.S. 465, 470 (1937). In this way, we "look[] to the objective economic realities of a transaction rather than to the particular form the parties employed." Frank Lyon Co., 435 U.S. at 573. Courts use the substance over form doctrine when a more wooden application of the Code would "deprive the statutory provision in question of all serious purpose" and would thereby "exalt artifice above reality." Gregory, 293 U.S. at 470. We therefore begin by determining the plain intent of the statutory provisions underpinning the taxpayers' transaction.

Congress created DISCs as a "part of a package of revisions to the tax code designed to stimulate economic activity." LeCroy Research Sys. Corp. v. Comm'r, 751 F.2d 123, 124 (2d Cir. 1984). "The DISC provisions in particular were designed to 'increase our exports and improve an unfavorable balance of payments.'" Id. (quoting S. Rep. No. 92-437, at 1 (1971), as reprinted in 1971 U.S.C.C.A.N. 1918, 1918)). According to the House Report, domestic corporations were being "treated less favorably than those which manufacture abroad through the use of foreign subsidiary corporations." H.R. Rep. No. 92-533 (1971), as

reprinted in 1971 U.S.C.C.A.N. 1825, 1872. DISCs would therefore help "remove a present disadvantage of U.S. companies engaged in export activities through domestic corporations." Id.

Both Congress and the Treasury Department understood that domestic export companies would use DISCs not only to reinvest in their businesses, but also to increase returns for their shareholders. As the Sixth Circuit observed, "[t]he Code authorizes companies to create DISCs as shell corporations that can receive commissions and pay dividends that have no economic substance at all." Summa Holdings, 848 F.3d at 786. Section 994(a) establishes the safe-harbor price rules for DISC commissions: if the commissions do not exceed 4% of gross receipts of 50% of net income from qualified exports, the commissions cannot be challenged under 26 U.S.C. § 482, which generally authorizes the Treasury to reallocate income to "prevent artificial shifting, milking, or distorting of the true net incomes of commonly controlled enterprises." Comm'r v. First Sec. Bank of Utah, N.A., 405 U.S. 394, 400 (1972). Treasury Regulation § 1.994-1(a) states that application of § 994(a) "does not depend on the extent to which the DISC performs substantial economic functions . . . ."[4]

---

[4] While Treasury Regulation § 1.994-1(a) may be read to preclude some applications of the economic substance doctrine to transactions involving DISCs, it does not, by itself, immunize the Benensons' transaction from application of the separate, albeit related, substance over form doctrine.

By design, Congress and the Treasury Department allowed domestic companies to defer taxation and pay out dividends to shareholders through a structure that might otherwise run afoul of the Code. See Addison Int'l, Inc. v. Comm'r, 90 T.C. 1207, 1221 (1988); see also Summa Holdings, 848 F.3d at 786 ("By congressional design, DISCs are all form and no substance . . . ."). In sum, we agree with the Sixth Circuit that Congress created DISCs "to enable exporters to defer corporate income tax." Summa Holdings, 848 F.3d at 786.

At a basic level, the parties agree that Congress designed Roth IRAs to incentivize long-term savings and investment by allowing for tax-free distribution to beneficiaries over age 59 1/2. The Commissioner, however, views the legislative purpose behind § 408A somewhat more narrowly, contending that Congress created Roth IRAs to incentivize savings "among America's working population." According to the Commissioner, the caps Congress placed on contributions to Roth IRAs "reflect clear Congressional intent to limit Roth IRAs' costs to the public fisc" and were meant to ensure that Roth IRAs would not "be used to divert unlimited business funds into tax-sheltered vehicles."[5]

---

[5] The Commissioner's view finds some support in the legislative history of the Taxpayer Relief Act of 1997. According to the House Report, the Committee was "concerned about the national savings rate." H.R. Rep. No. 105-148, at 337 (1997), as reprinted in 1997 U.S.C.C.A.N 678, 731. It observed that "the ability to make deductible contributions" to a traditional IRA "is

It bears repeating that traditional and Roth IRAs are subject to the same annual contribution limits. 26 U.S.C. §§ 219(b)(5)(A), 408A(c)(2). Contributions to either form of IRA that exceed the maximum allowed for deduction under § 219 are subject to a 6% excise tax. 26 U.S.C. § 4973(a); see also Hellweg v. Comm'r, 101 T.C.M. (CCH) 1261, 2011 WL 821090, at *9 (2011).

Roth IRAs are subject to some restrictions not found in traditional IRAs. The Code prevents some higher income taxpayers from contributing to Roth IRAs. 26 U.S.C. § 408A(c)(3). In 2008, single taxpayers with over $116,000 in modified adjusted gross income, as well as married taxpayers filing jointly with over $169,000 in modified adjusted gross income, could not contribute to Roth IRAs. Individual Retirement Arrangements (IRAs), I.R.S. Pub. No. 590, at 2 (Jan. 30, 2009). These limitations suggest that Congress was focused on providing a savings mechanism to taxpayers of more modest means than the Benensons.

At the same time, the Commissioner does not dispute that in 2002, James III and Clement were qualified to make the initial contributions to their Roth IRAs. And James III and Clement do not dispute that in 2008, they were not qualified to make

---

a significant savings incentive," but found that "this incentive is not available to all taxpayers under present law." Id. The Committee mentioned that "many Americans may have difficulty saving enough to purchase a home," and that a new form of IRA could help these individuals realize this "fundamental part of the American dream." Id.

contributions to their Roth IRAs because their annual incomes were too high.[6] James III and Clement claim that no one made contributions to their Roth IRAs in 2008; their Roth IRAs only received dividends from the shares they owned in JC Holding. It is these "dividends" that the Commissioner contends are, in substance, "contributions" that were made in excess of the contribution limit.[7]

We look to how the Code defines a "contribution" in this context. Section 408A states that "[e]xcept as provided in this section, a Roth IRA shall be treated for purposes of this title in the same manner as an individual retirement plan." 26 U.S.C. § 408A(a). The Code defines an IRA as "a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries" that meets some specific requirements. 26 U.S.C. § 408(a). The first of these requirements is that "no contribution will be accepted unless it is in cash." 26 U.S.C. § 408(a)(1).

---

[6] In 2008, both James III and Clement reported income above $500,000.

[7] The Commissioner presented two alternative ways by which the Roth IRAs received the "contributions": either James Jr. received $2,239,006 in dividends from Summa as Summa's sole shareholder, or James Jr. received $519,002 and the Benenson Trust received $1,702,764 in dividends based on their ownership interests in Summa. Summa Holdings, 109 T.C.M (CCH) at *11.

- 16 -

Once a contribution is made in cash, the cash can be invested, subject to certain limitations. For example, an IRA cannot invest in collectibles, including art, antiques, or stamps, and still realize the tax benefits of an IRA. 26 U.S.C. § 408(m). In almost all circumstances, IRAs are not permitted to own shares in S corporations. 26 U.S.C. § 1361(c)(2)(A)(vi); see also Taproot Admin. Servs., Inc. v. Comm'r, 679 F.3d 1109, 1110 (9th Cir. 2012).

The Code does, however, permit both traditional and Roth IRAs to own shares in C corporations. Taxpayers may, if they so choose, direct IRAs to purchase shares of C corporations. See Ancira v. Comm'r, 119 T.C. 135, 138 (2002). Many taxpayers, of many income levels, own shares in C corporations through Roth IRAs and traditional IRAs. See McGaugh v. Comm'r, 860 F.3d 1014, 1017 (7th Cir. 2017) (calling an IRA's purchase of stock in a privately held company "a prototypical, permissible IRA transaction"). As the Tax Court recognized below, one of the advantages of owning C corporation shares in a Roth IRA is that "[d]ivdends paid on stock held by a Roth IRA are considered earnings of the Roth IRA itself, rather than contributions by the owner of the Roth IRA, and do not count towards the contribution limits of section 408A." Summa Holdings, 109 T.C.M. (CCH) at *15 (citing Taproot Admin. Servs., Inc. v. Comm'r, 133 T.C. 202, 206 (2009)).

So, while contributions into Roth IRAs are limited each year, earnings of Roth IRAs, including dividends from corporations

owned by Roth IRAs, are not limited.  This makes sense.  Few would put money aside into retirement accounts without the expectation that the money would grow over time in the accounts.  Dividends from C corporations provide another avenue by which Roth IRA can grow in value.

For some taxpayers, Roth IRAs are safe places to squirrel away $5,000 in cash per year, with a hope of modest returns and tax-free distribution at retirement.  For other, often wealthier, taxpayers, Roth IRAs are strategic vehicles for investments in companies, which may pay out substantial dividends.  See Summa Holdings, 848 F.3d at 789.  Both uses comport with § 408A's fundamental purpose: to incentivize long-term savings and investment for retirement.

"The owner of an IRA is entitled to direct the investment of the funds without forfeiting the tax benefits of an IRA." McGaugh v. Comm'r, 111 T.C.M. (CCH) 1116, at *9 (2016), aff'd 860 F.3d 1014 (7th Cir. 2017).  So long as taxpayers are qualified to make initial contributions, it does not appear to violate § 408A's plain intent to allow their contributions to grow through investment in qualified privately held companies, even during periods where the taxpayers are no longer allowed to contribute, and even if such growth occurs at a swift rate.

For people in the Benensons' position, a Roth IRA is an extremely advantageous place to hold indirectly the shares and

- 18 -

proceeds of a DISC. In 2008, JC Holding paid $1,477,028 in dividends to James III and Clement's Roth IRAs, and "[t]he over $3 million in value that had accumulated in each of the Roth IRAs by the end of 2008 was solely attributable to the initial $3500 contribution made in 2002 . . . , payments received from JC Holding in the form of dividends, and earnings stemming from the investments made with such payments." While James III and Clement were prohibited from making Roth IRA contributions in 2008, they were not prohibited from continuing to receive both returns on their investments and dividends from the corporation owned by their Roth IRAs. Summa Holdings, 109 T.C.M. (CCH) at *15.

The Code contemplates IRA and corporate ownership of DISC shares. Section 995 sets forth the ways in which shareholders of DISCs are taxed on income from DISCs. Section 995(g) speaks directly to the treatment of tax-exempt shareholders of DISCs, such as IRAs, and provides that distributions and dividends to such shareholders "shall be treated as derived from the conduct of an unrelated trade or business" and will be subject to the unrelated business income tax. The unrelated business income tax is "set at the same rate as the corporate income tax." Summa Holdings, 848 F.3d at 782. Under 26 U.S.C. § 246(d), dividends from DISCs to corporations are subject to corporate income tax.

When §§ 995(g), 246(d), and 408A are read together, it appears Congress understood that Roth IRAs could also hold proceeds

- 19 -

from DISCs. Under § 995(g), if a Roth IRA owns DISC shares directly, it will have to pay the unrelated business income tax. Under § 246(d), if a Roth IRA owns a C corporation, and the C corporation owns DISC shares, the C corporation will have to pay the full corporate income tax on any dividends. In the present case, JC Holding paid income tax on the $2,161,965 it reported as distributions from JC Export at the corporate tax rate.[8]

"We assume that Congress is aware of existing law when it passes legislation." Miles v. Apex Marine Corp., 498 U.S. 19, 32 (1990). This is particularly true here, where Congress commanded in § 408A that, unless otherwise provided, Roth IRAs are to be treated in the same manner as traditional IRAs. We can therefore assume that when Congress created Roth IRAs, it was aware that traditional IRAs could receive dividends from both C corporations and DISCs and was comfortable with Roth IRAs engaging in the same transactions, so long as a tax equal to the corporate income tax, either under § 246(d) or under § 995(g), was paid.[9]

---

[8] From its founding through 2008, JC Holding's board of directors consisted of James Benenson Jr., James III, Clement, and one other individual. James III and Clement have also served as vice presidents and co-presidents during that same time period.

[9] The Tax Court considered and rejected this same line of reasoning below, calling it "logically erroneous." Summa Holdings, 109 T.C.M. (CCH) at *23. (citing Hellweg, 2011 WL 821090, at *6). We agree that courts generally should be reluctant "to infer the intent of one Congress from the views expressed by another." Sullivan v. Stroop, 496 U.S. 478, 494 n. 8 (1990). However, by commanding courts to treat Roth IRAs in the same manner as traditional IRAs, the 1997 Congress expressed its own intent to

Under these circumstances, we cannot conclude that the Benensons' transaction "upon its face lies outside the plain intent of the statute" such that approval of the transaction "deprive[s] the statutory provision[s] in question of all serious purpose." Gregory, 293 U.S. at 470. As outlined above, both DISCs and Roth IRAs "are designed for tax-reduction purposes." Summa Holdings, 848 F.3d at 786. The Benensons used DISCs, a unique, congressionally designed corporate form their family's business was authorized to employ, and Roth IRAs, a congressionally designed retirement account all agree they were qualified to establish, to engage in long-term saving with eventual tax-free distribution. Such use violates neither the letter nor the spirit of the relevant statutory provisions.

We are inclined to accept the congressionally sanctioned solution to a potential tax avoidance problem, rather than relying on a judicially crafted common law solution. See Patsy v. Bd. of Regents of State of Fla., 457 U.S. 496, 513 (1982) ("The very difficulty of these policy considerations, and Congress' superior institutional competence to pursue this debate, suggest that legislative not judicial solutions are preferable."). Congress added § 995(g) to ensure that some tax is paid when an IRA controls

subject Roth IRAs to the limits imposed by § 995(g). The 1997 Congress was not "silen[t]," Hellweg, 2011 WL 821090, at *6 -- it declared that the existing statutory backdrop should apply to Roth IRAs, including the existing solution for IRA ownership of DISCs.

- 21 -

a DISC. Here, the money flowing into James III and Clement's Roth IRAs was in fact taxed at the ordinary corporate income tax rate, with the IRS receiving $885,841 in income tax from JC Holding.

Congress has revisited the DISC program on several occasions to address other perceived inequities caused by it. See Summa Holdings, 848 F.3d at 790 (citing Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 801(a), 98 Stat. 494, 985). It has also revised the statutory framework surrounding Roth IRAs in a manner that cuts against the Commissioner's view of Roth IRAs as retirement tools available solely for the middle class. See id. at 789 (discussing "Congress's decision in 2005 to allow owners of traditional IRAs . . . to roll them over into Roth IRAs no matter how many assets the accounts hold or how high the owners' incomes"). Yet, despite its active history of legislating in these areas, Congress has not placed any further limits on transactions like the Benensons'.

If Congress does not view § 995(g) and § 246(d) as sufficient solutions to the potential problem raised by the Benensons' transaction, it may choose to reexamine the law in this area. But, in our more limited role, we cannot say that our tacit approval of the Benensons' transaction deprives the existing statutory framework of all serious purpose.

The Commissioner views the Benensons' transaction as different from other investments in privately held companies

because he claims there was no risk involved. But, to the extent that risk was required, it came from reliance on the DISC. The benefit of James III and Clement's Roth IRAs is necessarily tied, at least initially, to the success and profitability of Summa Holdings' export companies. If the export companies are not thriving, then they will produce no DISC commissions. Without DISC commissions, the Benensons' Roth IRAs would receive no dividends from JC Holding.

Moreover, if the Benensons' transaction presents a lower risk than other potential investment structures, it is due to the unique, congressionally designed DISC corporate form. Congress created DISCs to provide otherwise unavailable economic support to domestic exporters. We cannot, and do not, question this policy choice. All we can say is that "[i]f Congress sees DISC-Roth IRA transactions of this sort as unwise or as a creating an improper loophole, it should fix the problem." Summa Holdings, 848 F.3d at 790.

That is not to say that all transactions involving tax avoidance through Roth IRAs are immune from recharacterization under the substance over form doctrine. The Sixth Circuit cited and discussed with approval the Tax Court's decision in Repetto v. Commissoner, 103 T.C.M. (CCH) 1895, 2012 WL 2160440, at *9 (2012). Summa Holdings, 848 F.3d at 785-86. In Repetto, the taxpayers established "an ordinary [C] corporation owned by Roth IRAs and

- 23 -

pa[id] the corporation fees for sham 'services' it never performed," and the Sixth Circuit agreed that, in those circumstances, "the Commissioner may rightly refuse to recognize the Roth IRA's gains as investment earnings and may reclassify them as contributions." Id. The Tax Court itself recently recognized that "the substance-over-form doctrine is not something the Commissioner can use to pound every Roth IRA transaction he doesn't like." Block Developers, LLC v. Comm'r, 114 T.C.M. (CCH) 68, at *30 (2017). Because C corporations "unlike DISCs, are meant to have a real business purpose," the Commissioner retains the power to recharacterize transactions "where taxpayers used a corporate form that lacked any substance to facilitate a tax-avoidance scheme." Id.

The Notice does not save the Commissioner's position. It does not appear that the Benensons' transaction falls within the Notice's scope. The Notice describes transactions where "the acquisition of shares, the transactions or both are not fairly valued." Notice 2004-8, 2004-1 C.B. 333. Although the dissent claims "the DISC shares were not purchased at market prices," the Commissioner has never challenged the valuation of the shares the Roth IRAs purchased in either JC Export or JC Holding. Summa Holdings, 848 F.3d at 783.[10]

---

[10] Following oral argument, the Commissioner has brought to our attention a recent split decision from the Tax Court, Mazzei

- 24 -

Some may call the Benensons' transaction clever. Others may call it unseemly. The sole question presented to us is whether the Commissioner has the power to call it a violation of the Tax Code. We hold that he does not. The substance over form doctrine is not a smell test. It is, in this circuit, a tool of statutory interpretation. When, as here, we find that the transaction does

---

v. Commissioner, 151 T.C. No. 7, 2018 WL 1168766 (Mar. 5, 2018). Mazzei involved a transaction with some similarities to the Benensons'. The petitioners in Mazzei used Roth IRAs to purchase shares in a Foreign Sales Corporation (FSC), a then congressionally designed corporate form with some similar features to a DISC. However, unlike the DISC program, which remains active to this day, Congress repealed the FSC statutes in 2000. Id. at *2 n.4, *18 n. 41. Although Mazzei contains a wide-ranging discussion of the substance over form doctrine and the Sixth Circuit's decision in Summa Holdings, its holding is quite narrow. In Mazzei, the Tax Court viewed the Roth IRAs' initial purchase of FSC shares as without substance and thereby found that "the payments from the FSC were income to petitioners rather than to their Roth IRAs." Id. at *8. As the concurrence in Mazzei explained:

> The sole issue we decide today is who in substance owned this FSC -- petitioners or their Roth IRAs. The opinion of the Court focuses on the substance of a single step: the purported purchase of FSC stock by the Roth IRAs for the nominal price of $1, viewed together with the contracts that were entered into by petitioners, their Roth IRAs, and Injector Co., all in consideration of that nominal purchase.

Id. at *26 (Paris and Pugh, JJ., concurring)

Here, as we have said, the Commissioner has never challenged directly the valuation of the shares the Benenson Roth IRAs purchased in either JC Export or JC Holding. We therefore express no view on whether such a challenge would be successful or would change our analysis.

- 25 -

not violate the plain intent of the relevant statutes, we can push the doctrine no further.  In such circumstances, to the extent we accept "the government's proposition that these taxpayers have found a hole in the dike, we believe it one that calls for the application of the Congressional thumb, not the court's." Fabreeka Prod. Co. v. Comm'r, 294 F.2d 876, 879 (1st Cir. 1961).

**-Dissenting Opinion Follows-**

**LYNCH**, **Circuit Judge, dissenting**.  With great respect for my colleagues in the majority, I dissent because I think the Tax Court's opinion must be affirmed.  The effect of the majority decision will be to bless a device to eliminate the contribution limits Congress has imposed on Roth IRAs.  The decision will cost the public fisc millions of dollars in tax revenue.  This is an important case, and in my view the majority gets it wrong and violates rules of construction.

Congress, in creating DISCs, did not intend them to be catch-all tax avoidance devices.  Congress did not intend DISCs to cut through common law tax doctrines under any and all circumstances.  Congress intended exporters to use DISCs to defer corporate income tax, and the Benensons did not use the DISC in this case for that purpose.  They instead used it as a shield against the application of the time-honored substance over form doctrine in an effort impermissibly to funnel sums of money in the millions of dollars each year into their Roth IRAs.  Congress has never blessed such an arrangement, and the transaction at issue flouts Congress's intent to limit Roth IRA contributions.  The Commissioner was correct to recharacterize the transaction.  The majority is incorrect to hold that, because Congress intended a limited tax benefit through the use of a DISC, Congress intended, without saying so, to implicitly set aside its limit on Roth IRA contributions, an entirely different tax benefit.

A.    The Substance of this Transaction

The substance over form doctrine is "best . . . thought of as a tool of statutory interpretation."  Santander Holdings USA, Inc. v. United States, 844 F.3d at 15, 21 (1st Cir. 2016). The IRS's recharacterization of a transaction must be upheld when the transaction "lies outside the plain intent of the statute." Id. (quoting Gregory v. Helvering, 293 U.S. 465, 470 (1935)); see also Knetsch v. United States, 364 U.S. 361, 365 (1960) ("[T]he question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." (quoting Gregory, 293 U.S. at 469)).

Courts analyze various factors when determining whether, under common law tax doctrines, a transaction is consistent with congressional intent.  These factors include whether the entities involved have no business purpose, Gregory, 293 U.S. at 469-70; whether related entities were used to shift tax liabilities between related taxpayers, see Palmer v. Comm'r, 354 F.2d 974, 975 (1st Cir. 1965); whether the transaction used a circuitous route or intermediary entities for the sole purpose of decreasing the taxpayer's liability, Minn. Tea Co. v. Helvering, 302 U.S. 609, 613 (1938); and whether the entities involved assumed any risk, see Merck & Co. v. United States, 652 F.3d 475, 484-85 (3d Cir. 2011).

The transaction here was tax-gaming, devoid of substance.  The companies and Roth IRAs involved were all owned by members of the same family, the DISC shares were not purchased at market prices, and the sole reason for the transaction was to circumvent the contribution limits for Roth IRAs.  In addition, the parties agree that JC Export and JC Holding would not exist but for this scheme, that those entities engaged in no business of any kind, and that they served no purpose other than funneling money into the Benensons' Roth IRAs.

It is equally clear that the transaction involved no risk.  The majority claims that this transaction involved risk because the benefit to the Roth IRAs "is necessarily tied, at least initially, to the success and profitability of Summa Holdings' export companies."  This is not accurate.  If Summa Holdings becomes unprofitable, the Roth IRAs will lose nothing because the money has already been transferred to them.  The purpose of this tax scheme plainly was to circumvent the Roth IRA contribution limitations, and that was accomplished as soon as JC Export paid a dividend to the Roth IRAs.  The fact that Summa Holdings needed to reach a certain level of success before engaging in this scheme does not mean that the transaction involved economic risk.

James III and Clement purchased the outstanding shares of JC Export for $1500 each and then received millions in dividends from those shares over the next few years.  In effect, the

Benensons jammed millions of dollars into their Roth IRAs at a time when their incomes were too high for them to contribute to the IRAs at all, and that money can now be invested and distributed tax-free. This does not remotely resemble a real transaction of economic substance. In fact, Summa Holdings paid dividends to its shareholders, who then contributed to the Roth IRAs.

Had this transaction used a C corporation (or an LLC or almost any other type of entity) to pass money from Summa Holdings into the Roth IRAs, recharacterization would clearly be appropriate. See Repetto v. Comm'r, 103 T.C.M. (CCH) 1895, 2012 WL 2160440, at *9 (2012); Block Developers LLC v. Comm'r, 114 T.C.M. (CCH) 68, 2017 WL 3078319, at *11 (2017); Polowniak v. Comm'r, 111 T.C.M. (CCH) 1132, 2016 WL 758360, at *8 (2016). But the Benensons found a different, albeit equally brazen, way to skirt the Roth IRA contribution limitations: they used a DISC to transfer the money from Summa Holdings to the Roth IRAs. The majority views that difference -- the use of a DISC -- as decisive. The majority does so on the grounds that the substance over form doctrine cannot apply here because DISC commissions do not need to have economic substance, and, further, that Congress intended for Roth IRAs to own DISCs.

I disagree. The DISC here was not used for the purpose intended by Congress, but to evade the Roth IRA contribution limits. The other statutory provisions adverted to by the majority

- 30 -

do not support its conclusion.  Congress did not intend the use of DISCs to circumvent well established Roth IRA contribution limits and certainly did not say so.

B.    Congressional Intent

DISCs are only insulated from the application of common law tax doctrines in certain defined and narrow ways, see Treas. Reg. § 1.994-1(a), because, without that narrow insulation, DISCs could not serve their intended purpose.  DISCs are meant to reduce the tax burden on exporters by allowing them to defer corporate-level taxation.  H.R. Rep. No. 92-533 (1971), as reprinted in 1971 U.S.C.C.A.N. 1825, 1832, 1872.  If commissions paid from a company with qualified export revenue to a DISC needed to have economic substance, these provisions could not function as Congress intended.  But we are faced with a very different issue.  This case is not about whether the IRS must honor the commissions paid from Summa Holdings to JC Export for corporate income tax purposes; it is about whether the IRS must honor the Benensons' characterization of the flow of money from Summa Holdings to the Benensons' Roth IRAs for excise tax purposes.

1.    The Benensons' Use of a DISC

The use of the DISC here to evade the Roth IRA limits is contrary to Congress's intended purpose for DISCs of corporate tax deferral.  Because commissions paid to JC Export were immediately distributed to JC Holding and JC Holding paid corporate tax on

dividends received from JC Export, the DISC itself did not result in a tax benefit to the Benenson family.  The Benensons conceded as much.  They stipulated that the "sole reason for entering into the Transaction at Issue . . . was to transfer money into the Roth IRAs so that income on assets in the Roth IRAs could accumulate and be distributed on a tax-free basis."  (emphasis added).  The taxpayers made no mention of corporate tax deferral because there was none.

The only reason a DISC was used as the intermediary was as a device to attempt to escape the application of common law tax doctrines.  That use is contrary to what Congress intended. Congress created DISCs to advantage exporters by giving them a corporate tax deferral benefit.  See 26 U.S.C. §§ 991-97; H.R. Rep. No. 92-533 (1971), as reprinted in 1971 U.S.C.C.A.N. 1825, 1872.  DISCs' exemption from common law tax doctrines in that limited area is a means of achieving that purpose, and goes no further.  As a result, DISC commissions escape the use of common law tax doctrines only to the extent necessary to achieve the intended corporate tax deferral.  The use of a DISC does not grant a taxpayer carte blanche to enter into artificial and economically insubstantial transactions without fear of recharacterization. Congress never said that DISCs can be used to avoid Roth IRA contribution limits or that the substance over form doctrine did not apply to DISCs.  Rather, the absence of such a statement is

telling. Congress does not "hide elephants in mouseholes." Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001). If Congress had intended to exempt all transactions that involve DISCs and Roth IRAs from the application of longstanding common law tax doctrines, it would have said so directly.

## 2. Sections 246(d), 995(g), and 408A

Having established that the DISC was not used for the purpose of corporate tax deferral, we are left with the majority's argument that the substance over form doctrine cannot apply here because the separate provisions in 26 U.S.C. §§ 246(d), 995(g) and 408A supposedly evince Congress's intent that Roth IRAs be permitted to own DISCs. The Benensons never made a § 246(d) argument, so that portion of the argument is waived. See Negron-Almeda v. Santiago, 528 F.3d 15, 25 (1st Cir. 2008). In any case, this line of reasoning is invalid. The majority's argument amounts to the following: Congress took steps to make sure corporate-level tax was paid on DISC income when a traditional IRA or a C corporation was involved, and so it must have silently and implicitly approved using a DISC to circumvent Roth IRA contribution limits. The premise is accurate, but the conclusion does not follow.

First, §§ 246(d) and 995(g) were enacted for a different purpose: to eliminate tax avoidance opportunities, not to create them. Section 995(g) requires that traditional IRAs pay an

unrelated business income tax on DISC commissions received. 26 U.S.C. §§ 995(g), 501(a). This was in response to an avoidance strategy where a DISC would pay a dividend to a traditional IRA in order to avoid corporate income tax. H.R. Rep. No. 101-247 (1989), as reprinted in 1989 U.S.C.C.A.N. 1906, 2895. But ending a tax avoidance scheme that was prevalent more than a decade before Roth IRAs even existed is different from expressing an intention that Roth IRAs own DISCs. That is why, in an earlier case, the Tax Court found it was "logically erroneous" to argue that Congress validated the ownership of DISC stock by Roth IRAs when it adopted § 995(g) with the aim of preventing a different tax avoidance strategy. Hellweg v. Comm'r, 101 T.C.M. (CCH) 1261, 2011 WL 821090, at *6 (2011).

The same is true of § 246(d). The dividends-received deduction exists to avoid exposing corporate earnings to multiple layers of corporate taxation. H.R. Rep. No. 92-533 (1971) as reprinted in 1971 U.S.C.C.A.N. 1825, 1903. Section 246(d) was passed in 1971 because DISCs do not pay corporate tax, so there is no risk of exposing corporate earnings to multiple layers of corporate taxation where the entity paying the dividend is a DISC. Id. This provision, enacted over twenty-five years before Roth IRAs came into existence, does not mention or relate to traditional or Roth IRAs. See 26 U.S.C. § 246(d). The fact that Congress wanted to ensure that DISC income was exposed to at least one layer

- 34 -

of corporate income tax has nothing to do with Roth IRA contribution limits.

Even if the combination of these statutes did indicate that Congress expected Roth IRAs to own DISC stock, that would not help the Benensons' case at all. Allowing IRAs to own DISC stock is different from exempting transactions involving DISCs and IRAs from common law tax doctrines and contribution limits. Roth IRAs are allowed to own C corporations, but that does not mean that the substance over form doctrine cannot apply to C corporations used to circumvent Roth IRA contribution limits. The Tax Court has so held. See Repetto, 2012 WL 20160440 at *16. The Tax Court here never stated that Roth IRAs are prohibited from owning DISC stock. The Tax Court's holding was much narrower: this specific transaction was, in substance, a dividend to shareholders followed by contributions to the Roth IRAs. Summa Holdings, Inc. v. Comm'r, 109 T.C.M. (CCH) 1612, 2015 WL 3993219, at *7 (2015).

The majority says Congress could have forbidden the transaction here if it wanted. But the absence of special legislation to forbid this evasion of statutorily set contribution limits is not permission to evade those limits. As the Tax Court stated in Hellweg, the legislation in this area "may merely represent a choice to determine whether such distributions produce an excess contribution on a case-by-case basis according to the facts and circumstances. Not every silence is pregnant." 2011 WL

821090 at *6.  The Tax Court made such a fact-specific decision here, and nothing in §§ 246(d), 995(g), or 408A indicates Congress intended anything different.

All the majority shows with its §§ 246(d), 995(g), and 408A argument is that Congress may have intended to allow traditional IRAs to own DISC stock.  But there is no reason to believe that the substance over form doctrine would not have applied if the Benensons had developed a scheme to circumvent the contribution limit for traditional IRAs and if, in substance, that scheme was a distribution to shareholders followed by a contribution to the traditional IRAs.  There has not been a case on this issue, likely because distributions from traditional IRAs are not tax-free.

The crux of the majority's argument on this point is that the substance over form doctrine cannot apply to a DISC because the Roth IRA is allowed to own a DISC, and DISCs can avoid common law tax doctrines.  That conclusion does not follow. Indeed, this line of reasoning would allow IRA contribution limits to be circumvented at will and is inconsistent with the longstanding substance over form doctrine.

As discussed below, there is no doubt that the substance over form doctrine applies even to Code-compliant transactions. The question then is whether DISC transactions are exempt from the application of the substance over form doctrine where, as here,

- 36 -

the DISC was not used for its congressionally intended purpose. Because the exemption from common law tax doctrines is a means of providing a corporate tax deferral benefit, I do not believe transactions involving DISCs are exempt from common law tax doctrines where the DISC was not used for Congress's intended purpose.[11]  The Tax Court's ruling is far more consistent with Congress's intent than is the majority's holding.

### 3.    Congressional Inaction

The majority implies that its holding is supported by the fact that Congress has revisited the DISC provisions multiple times without addressing the Benensons' scheme.  This argument was not briefed, so it is waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Even if the argument were not waived, it depends on an assumption that is not true.  The record contains no suggestion that, when Congress revisited the provisions at issue in this case,

---

[11]    While the Benensons did not benefit from any corporate tax deferral here, they could have engineered the underlying scheme to allow them to benefit from corporate tax deferral and circumvent the Roth IRA contribution limits.  Had the Benensons done so, that would not alter my view as to the excise tax issue before us.  The exemption from common law tax doctrines applied to DISCs, which is not even made explicit in statute, only exists to further Congress's intended purpose.  Congress intended to facilitate corporate tax deferral, not the circumvention of Roth IRA contribution limits.  As a result, even if the Benensons' entities had engaged in corporate tax deferral, as they did not, that still would not shield them from the application of the substance over form doctrine for excise tax purposes.

it was aware of this scheme and had proposed legislation to outlaw it. Even if legislation targeting the Benensons' scheme had been introduced in Congress, courts have repeatedly advised against construing congressional inaction as to proposed legislation as approval of the status quo. See, e.g., Aaron v. SEC, 446 U.S. 680, 694 n.11 (1980).

C.    Code-Compliant Transactions

The majority argues that if there is a problem here, it is for Congress to resolve. My response is that Congress created the DISC provisions against the background of decades of common law tax doctrines, under which such transactions are forbidden. The Benensons' transaction is clearly incompatible with congressional intent. Further, Supreme Court precedent is clear that an otherwise Code-compliant transaction can be recharacterized where it is inconsistent with congressional intent. Comm'r v. Court Holding Co., 324 U.S. 331, 334 (1945); Minn. Tea Co., 302 U.S. at 613; Deidrich v. Comm'r, 457 U.S. 191, 195-99 (1982); Gregory, 293 U.S. at 470 (1935) (recharacterizing a transaction because "[t]he whole undertaking, though conducted according to [the relevant Code section], was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else").

This circuit, other circuits, and the Tax Court agree that common law tax doctrines apply to Code-compliant

transactions.  See, e.g., <u>Santander Holdings</u>, 844 F.3d at 23 (holding that when a transaction is only designed to produce tax gains instead of real gains, "it is an act of tax evasion that, even if technically compliant, lies outside of the intent of the Tax Code and so lacks economic substance"); <u>BB&T Corp.</u> v. <u>United States</u>, 523 F.3d 461, 477 (4th Cir. 2008)(finding that the Commissioner was "entitled to recognize [the transaction] for what it was, not what [the taxpayer] professed it to be"); <u>Repetto</u>, 2012 WL 20160440 at *9 ("Where a series of transactions, taken as a whole . . . have no 'purpose, substance, or utility apart from their anticipated tax consequences,' the transactions are not recognized for Federal tax purposes." (quoting <u>Goldstein</u> v. <u>Comm'r</u>, 364 F.2d 734, 740 (2d Cir. 1966))).

I give weight to the Supreme Court's <u>Court Holding</u> decision and do not think we can sidestep this precedent by characterizing the opinion as "brief" and distinguish it, as one circuit has done, by saying "it's hard to say whether the Court determined that the liquidation before the sale was a sham or recharacterized the transactions based solely on their tax-minimizing effect."[12]  <u>Summa Holdings, Inc.</u> v. <u>Comm'r</u>, 848 F.3d

---

[12]    I do agree with the majority that the Sixth Circuit's decision in <u>Summa Holdings, Inc.</u> v. <u>Commissioner</u>, 848 F.3d 779 (6th Cir. 2017) has no preclusive effect here and comity does not require that we adhere to the Sixth Circuit's views, much less on the different question before us.

779, 786 (6th Cir. 2017). In my view, Court Holding was clearly announcing that the substance over form doctrine applied even where the transaction was Code-compliant. In that case, the Fifth Circuit had found that the IRS could not recharacterize the transaction in question because "the purpose to escape or reduce taxation in making such a choice of procedure is not unlawful. The procedure actually followed is taxable by the law applicable to it." Court Holding Co. v. Comm'r, 143 F.2d 823, 825 (5th Cir. 1944), rev'd, 324 U.S. 331 (1945). The Supreme Court, without stating that the transaction was a sham, overturned that decision on the grounds that "[t]o permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." Court Holding, 324 U.S. at 334. The Benensons admit that the transactions at issue were mere formalisms created solely to alter tax liabilities; Court Holding instructs that the Commissioner may take such facts into account. Id.

For these reasons, I respectfully dissent.

- 40 -