**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CELIA MAZZEI; ANGELO L. MAZZEI;
MARY E. MAZZEI,
  *Petitioners-Appellants*,

v.

COMMISSIONER OF INTERNAL
REVENUE,
  *Respondent-Appellee.*

No. 18-72451

Tax Ct. Nos.
16702-09
16779-09

OPINION

Appeal from a Decision of the
United States Tax Court

Argued and Submitted February 14, 2020
Pasadena, California

Filed June 2, 2021

Before: Jay S. Bybee and Daniel P. Collins, Circuit Judges,
and Barry Ted Moskowitz,* District Judge.

Opinion by Judge Collins

---

*The Honorable Barry Ted Moskowitz, United States District Judge for the Southern District of California, sitting by designation.

## SUMMARY[**]

### Tax

The panel reversed a decision by the full Tax Court in favor of the Commissioner on a petition for redetermination of federal excise tax deficiency, in a case involving the use of a Foreign Sales Corporation to reduce the tax paid on income that was then distributed as dividends to Roth Individual Retirement Accounts.

Appellants established a FSC under since-repealed provisions of Internal Revenue Code §§ 921–927 (the FSC statute). Under the FSC statute, a corporation with foreign trade income could establish a related FSC as a shell corporation and then effectively cycle a portion of that income through the FSC where it would be taxed at lower rates. As a result, the FSC's taxable income was generated through related-party transactions that lacked meaningful economic substance. The FSC taxation rules thus reflected a departure from the normal principle that taxation is based on economic substance rather than on legal form.

Appellants made their Roth IRAs formal shareholders of their FSC. Appellants' export corporation paid commissions into the FSC, and the FSC's after-tax income was returned as dividends and distributed to appellants' IRAs rather than to their export corporation. As a result, no tax was paid when the money was received into the Roth IRAs, and no tax would be paid on qualified withdrawals from the Roth IRAs.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The Commissioner challenged this scheme, asking the Tax Court to recharacterize the entire scheme under the doctrine of substance over form. The Tax Court held that, under substance-over-form principles, appellants—not the Roth IRAs—were the real owners of the FSC. This meant that appellants should be deemed to have received the dividends, their contributions to the Roth IRAs exceeded the statutory limits for such contributions, and appellants were consequently liable for excise taxes on the excess contributions.

The panel concluded that, due to the unusual statutory provisions at issue here, the Tax Court erred by invoking substance-over-form principles to effectively reverse congressional judgment and to disallow what the statute plainly allowed. The panel joined three other circuits that have similarly disallowed the invocation of substance-over-form principles to undo the congressionally authorized separation of substance and form that is involved in an entity similar to the FSC at issue here.

**COUNSEL**

Lewis R. Walton Jr. (argued) and Lewis R. Walton, Walton & Walton LLP, Marina Del Ray, California, for Petitioners-Appellants.

Judith A. Hagley (argued), Gilbert S. Rothenberg, and Teresa E. McLaughlin, Attorneys, Tax Division; Richard E. Zuckerman, Principal Deputy Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Respondent-Appellee.

## OPINION

COLLINS, Circuit Judge:

Angelo, Mary, and Celia Mazzei appeal the Tax Court's ruling that they are liable for excise taxes for having made excess contributions to their Roth Individual Retirement Accounts ("IRAs"). Invoking substance-over-form principles, the Commissioner insists that the dividends that the Mazzeis' Roth IRAs received from a specific corporation were actually contributions from the Mazzeis, because the Commissioner deemed the Mazzeis, rather than the IRAs, to be the real owners of that corporation. Over the vigorous dissent of four judges, the full Tax Court sided with the Commissioner. Because we conclude that the unusual statutory provisions at issue here expressly elevated form over substance in the relevant respects, the Tax Court erred by invoking substance-over-form principles to effectively reverse that congressional judgment and to disallow what the statute plainly allowed.

The underlying dispute arises from the Mazzeis' establishment of a Foreign Sales Corporation ("FSC") under the since-repealed provisions of Internal Revenue Code §§ 921–927 ("the FSC statute"). As we explain in detail below, FSCs were an unusual type of corporation that Congress first authorized in 1984 to promote exports and that the World Trade Organization held in 2000 constituted an impermissible trade subsidy. Under the FSC statute, a corporation with foreign trade income could establish a related FSC as a shell corporation and then effectively cycle a portion of that income through the FSC where it would be taxed at lower rates. Specifically, the export corporation could pay tax-deductible "commissions" to the FSC that did not correspond to any actual services provided by the FSC but that were instead determined according to complex

statutory formulas. The FSC would pay a modest tax on the resulting income, and the FSC would then return the remaining income back to the export corporation (or a related entity) as dividends, usually tax-free. As a result, the FSC's taxable income was largely generated through related-party transactions that lacked meaningful economic substance, and the FSC taxation rules thus reflected a sharp departure from the normal principle that taxation is based on economic substance rather than on legal form.

The Mazzeis (and many others) took this one step further by having their Roth IRAs be the formal shareholders of the FSC. This meant that, when the FSC's after-tax income was being returned as dividends, it was distributed to the IRAs rather than to the export corporation that had paid the commissions into the FSC. As a result, no tax was paid when the money was received into the Roth IRAs, no tax would be paid on the growth of those funds over time, and no tax would be paid if and when the Mazzeis made qualified withdrawals from the Roth IRAs. The Commissioner thought that this arrangement was too good to be true, and he challenged what the Mazzeis had done here, as well as similar arrangements involving other taxpayers invoking related strategies. The Tax Court declined to adopt the Commissioner's broad effort to recharacterize the relevant transactions as a whole, and the court instead held only that, under substance-over-form principles, the Mazzeis rather than the Roth IRAs were the real owners of the FSC. That meant that the Mazzeis should be deemed to have received the dividends. And that meant, in turn, that the Roth IRAs received those funds as contributions from the Mazzeis, and these were well in excess of the statutory limits on such contributions. As a result, the Tax Court concluded, the Mazzeis were liable for excise taxes on the excess contributions.

Three circuits have addressed comparable questions in the context of a similar type of corporation allowed by the Internal Revenue Code, namely, a Domestic International Sales Corporation ("DISC"). All three courts reversed the Tax Court and disallowed the invocation of substance-over-form principles to undo the congressionally authorized separation of substance and form that is involved in a DISC. We reach a similar conclusion as to FSCs here, and we therefore reverse the judgment of the Tax Court.

# I

This is a case in which the details matter a great deal, and so we first set forth the complex legal backdrop and then explain the specific facts of this case.

# A

The legal context for this dispute involves three different entities that are (or were) specially authorized by the Internal Revenue Code, namely, Roth IRAs, FSCs, and DISCs. Although the Mazzeis did not use a DISC, the FSC regime was expressly modeled after the DISC system, and so an understanding of the latter will help to elucidate the distinctive features of the former. Moreover, the only circuit decisions addressing comparable issues arose in the DISC context, thereby underscoring the importance of understanding both types of corporations. Accordingly, we briefly review the key features of the Roth IRA, DISC, and FSC.

# 1

Congress first authorized tax-advantaged IRAs in 1974, initially as a means of providing retirement assistance to those who lacked coverage under a pension plan. *See*

Employee Retirement Income Security Act of 1974, Pub. L. 93-406, § 2002, 88 Stat. 829, 958–64. Congress has substantially expanded the availability of IRAs since then, and it has made numerous changes to the tax treatment of such accounts. In particular, Congress in 1997 authorized a new alternative type of IRA called a "Roth IRA." *See* Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 302(a), 111 Stat. 788, 825.

The tax treatment of earnings in a Roth IRA are generally the same as for a traditional IRA: earnings grow tax-free, except that they remain "subject to the taxes imposed by section 511" concerning unrelated business income. I.R.C. § 408(e)(1). But the tax treatment of contributions and withdrawals differs sharply for a Roth IRA versus a traditional IRA. With a traditional IRA, authorized contributions into the account are deductible from taxable income, *see id*. § 219(a), but subsequent authorized withdrawals are generally subject to taxation as ordinary income, *see id*. § 408(d)(1). For a Roth IRA, these rules are reversed: no deduction is allowed for a contribution into a Roth IRA, *see id*. § 408A(c)(1), but distributions from a Roth IRA are not taxable, *id*. § 408A(d)(1). Loosely speaking, money is taxed only before going *into* a Roth IRA, and money is taxed only on the way *out* of a traditional IRA.

Given the significant tax advantages of a Roth IRA, in which funds grow tax free and then *remain* free from taxation upon authorized distribution, Congress has established a statutory formula that strictly limits contributions to Roth IRAs. *See* I.R.C. § 408A(c). Under that formula, as a taxpayer's income increases, the contribution limit generally decreases. *Id*. To enforce such contribution limits to Roth IRAs (as well as other tax-favored vehicles), Congress has imposed a 6 percent tax on

excess contributions, subject to the proviso that the amount of the tax cannot exceed 6 percent of the value of the account. *Id*. § 4973(a), (f). Moreover, a comparable excise tax is imposed each subsequent year unless and until an amount corresponding to the excess contribution is properly removed from the Roth IRA. *Id*. § 4973(b)(2).

**2**

To promote exports of domestic goods, Congress in 1971 authorized the creation of DISCs, which are governed by special rules that allow companies to reduce the taxes they pay on export income. *See* Revenue Act of 1971, Pub. L. No. 92-178, §§ 501–507, 85 Stat. 497, 535–53. The DISC system has been amended over the intervening years, and we briefly sketch its key features in their present form.

The central feature of the DISC system is a special statutory exception for DISCs from the normal rules that govern allocation of income between "two or more organizations, trades, or businesses . . . owned or controlled directly or indirectly by the same interests." I.R.C. § 482. Under this statutory exception, the shareholders of a corporation with products to export can create a commonly controlled DISC and then "sell" those products "to the DISC at a *hypothetical* 'transfer price' that produce[s] a profit for both seller [*i.e.*, the export corporation] and buyer [*i.e.*, the DISC] when the product [is] resold to the foreign customer." *Boeing Co. v. United States*, 537 U.S. 437, 441 (2003) (emphasis added). This hypothetical "transfer price" for the sale of goods between the two commonly controlled entities is not based on any underlying economic reality, but is instead set artificially in accordance with a complex statutory formula. I.R.C. § 994(a) (explicitly stating that, in the case of a "sale of export property" to the DISC, income can be allocated to the DISC in accordance with the statutory

formula "regardless of the sales price actually charged"). The details of that statutory formula are not relevant here. What matters is that the ultimate consequence of these rules is effectively to reallocate a portion of the company's export income to the DISC, where that income would not be subject to corporate income tax. *See id*. § 991.

Although the statute itself articulates these special rules only in the context of the "*sale* of export property to a DISC" by a commonly controlled entity, I.R.C. § 994(a) (emphasis added), the statute also instructs the Secretary of the Treasury to issue regulations establishing comparable rules applicable in "the case of *commissions*, rentals, and other income" between a DISC and a commonly controlled entity, *id*. § 994(b) (emphasis added). The Secretary has issued such regulations, which allow an export corporation to obtain comparable advantages by paying a hypothetical "commission" to a commonly controlled DISC for the latter's provision of export services. *See* 26 C.F.R. § 1.994-1(d)(2). These regulations set forth specific instructions for calculating the "maximum commission the DISC may charge" the export corporation and the "amount of the income that may be earned by the DISC in any year" in connection with "qualified export receipts." *Id*. § 1.994-1(d)(2)(i)–(ii). Once again, the details of these formulas are not relevant for present purposes. The key point is that, under these special rules, an export corporation may pay a tax-deductible "commission" to the DISC in an amount that, as a general matter, is explicitly divorced from the value of any services actually provided by the DISC. *See id*. § 1.994-1(a)(2) (application of these rules "does not depend on the extent to which the DISC performs substantial economic functions (except with respect to export promotion expenses)"); *see also id*. § 1.993-1(k)(1) (to earn such commissions, "such DISC need not have employees or

perform any specific function").[1]   The DISC, in turn, is generally exempt from any tax on its income from these commissions.  I.R.C. § 991.

As a result of these unique rules, neither the export corporation nor the DISC pays any income tax on the applicable income that is attributable to the corporation's qualified export receipts but that was effectively allocated *to the DISC* by way of (as the case may be) the hypothetically priced sale or the artificially determined "commissions." Income tax is generally only paid when the DISC distributes its received commissions as dividends to the DISC's shareholders, either because the DISC actually pays out the dividends, *see* I.R.C. §§ 1(h)(11), 246(d), or because, according to a detailed statutory formula, the shareholder is deemed to have "received a distribution taxable as a dividend with respect to his [or her] stock," *id*. § 995(b)(1).

---

[1] The regulation gives the following stark example to illustrate just how much of a shell a DISC can be and still earn commissions:

> P Corporation forms S Corporation as a wholly-owned subsidiary.  S qualifies as a DISC for its taxable year. S has no employees on its payroll.  S is granted a sales franchise with respect to specified exports of P and will receive commissions with respect to such exports. Such exports are of a type which will produce gross receipts for S which are qualified export receipts as defined in paragraph (b) of this section.  P's sales force will solicit orders in the name of P.  Billings and collections are handled directly by P.  Under these facts, the commissions paid to S for such taxable year with respect to the specified exports shall be treated for Federal income tax purposes as the income of S, and the amount of income allocable to S is determined under section 994 of the Code.

26 C.F.R. § 1.993-1(k)(3) (example 2).

The "net effect" of these complex rules is thus to allow an export company to ultimately transfer a portion of its export revenue to the DISC's shareholders (who are often either the export company or its shareholders) in the form of dividends, *without* having it ever being taxed "as corporate income." *Summa Holdings, Inc. v. Commissioner*, 848 F.3d 779, 782 (6th Cir. 2017).

The Internal Revenue Code explicitly contemplates that tax-exempt entities—a category that now includes Roth IRAs—may own shares of a DISC. It does so by establishing a special rule that applies when the "shareholder in a DISC" is an "organization . . . subject to tax under section 511." *See* I.R.C. § 995(g). As noted earlier, that category includes traditional IRAs and, since their authorization in 1997, Roth IRAs. *See id*. § 408(e)(1) (stating that, although IRAs are generally exempt from income taxation, they are "subject to the taxes imposed by section 511"); *see also supra* at 7. Under this special rule, when an IRA owns the shares of a DISC, any dividends distributed, or deemed distributed, to the IRA are generally "treated as derived from the conduct of an unrelated trade or business," I.R.C. § 995(g), and therefore subject to taxation under § 511. That unrelated-business-income tax rate is "equal to the corporate rate," which is generally higher than the "dividend rate" that would apply to DISC dividends paid to an *individual* shareholder of a DISC. *See Benenson v. Commissioner*, 910 F.3d 690, 694 (2d Cir. 2018).[2] As a result, when a traditional IRA holds shares in a DISC, the "DISC dividends are subject to high unrelated business income tax when they go *into* [that] traditional IRA and, like

---

[2] When a corporation that is subject to income tax is the owner of a DISC's shares, it must generally pay income tax, at the corporate rate, on dividends received from a DISC. I.R.C. § 246(d).

all withdrawals from [a] traditional IRA, are subject to personal income tax when taken out." *Id*. (emphasis added) (citing *Summa Holdings*, 848 F.3d at 783). That makes a *traditional* IRA a singularly unattractive vehicle for holding DISC shares. *Id*. And that is no accident—Congress enacted the special taxation rule in § 995(g) in 1989 precisely because, under the prior rule in which "tax-exempt entities like IRAs paid nothing on DISC dividends," export companies were "shield[ing] active business income from taxation by assigning DISC stock to controlled tax-exempt entities like pension and profit-sharing plans." *Summa Holdings*, 848 F.3d at 782.

But the situation with a *Roth* IRA is somewhat different. To be sure, a Roth IRA, like a traditional IRA, generally must still pay unrelated-business-income tax on dividends received from a DISC. I.R.C. §§ 511, 995(g). However, once those monies are safely in a Roth IRA, they can thereafter grow tax-free and—unlike a traditional IRA— they are *not* subject to income tax when they are properly distributed out of the Roth IRA. For some taxpayers, that can make a Roth IRA an attractive vehicle for holding DISC shares.

**3**

"Soon after its enactment, the DISC statute became 'the subject of an ongoing dispute between the United States and certain other signatories of the General Agreement on Tariffs and Trade (GATT)' regarding whether the DISC provisions were impermissible subsidies that violated our treaty obligations." *Boeing Co.*, 537 U.S. at 442 (citation omitted). As a result, Congress in 1984 authorized a distinct but similar entity known as a "Foreign Sales Corporation" or "FSC." *See* Deficit Reduction Act of 1984, Pub. L. No. 98-369, §§ 801–805, 98 Stat. 494, 985–1003. The hope was that

the FSC system, which would serve as an alternative to a modified DISC scheme, would ameliorate such international controversy. *Boeing Co.*, 537 U.S. at 442. That hope proved illusory, and the FSC regime itself was determined by the World Trade Organization in March 2000 to be "an impermissible subsidy." *Ford Motor Co. v. United States*, 908 F.3d 805, 808 (Fed. Cir. 2018). Congress promptly repealed the FSC provisions in November 2000, but the repeal statute contained transition provisions that allowed for certain existing FSCs to continue for a specified time. *See* FSC Repeal and Extraterritorial Income Exclusion Act of 2000, Pub. L. No. 106-519, 114 Stat. 2423.[3] Throughout all of this, Congress did not eliminate the alternative DISC regime, whose current form we described earlier. *See supra* at 8–12.

The statutory provisions governing FSCs were set forth in former §§ 921–927 of the Internal Revenue Code.[4] In

---

[3] Specifically, § 5 of the repeal statute specified that FSCs could not be formed after September 30, 2000, but that for active FSCs in existence as of that date, the repeal generally would not apply to transactions involving the FSC (1) that occurred before January 1, 2002; or (2) that occurred after December 31, 2001, pursuant to certain binding contracts in effect on September 30, 2000. *See* Pub. L. No. 106-519, § 5(b)(1), (c), 114 Stat. at 2433. (The second of these transitional rules, concerning transactions pursuant to certain binding contracts, was itself later repealed for taxable years beginning after May 17, 2006. *See* Tax Increase Prevention and Reconciliation Act of 2005, Pub. L. No. 109-222, § 513(a), 120 Stat. 345, 366 (2006).)

[4] All citations of those sections in this opinion refer to the 1999 edition of the Code, which is available at https://www.govinfo.gov/app/collection/uscode/1999/. Likewise, all citations of the regulations governing FSCs refer to the 1999 edition of the Code of Federal Regulations.

contrast to DISCs, which are domestic corporations, a FSC[5] generally must be organized under the laws of certain foreign countries or under the laws applicable to a U.S. possession. I.R.C. § 922(a)(1)(A). The centerpiece of the FSC system was similar to that of the DISC system, *viz.*, an explicit statutory exception from the ordinary rules that govern allocation of income between "two or more organizations, trades, or businesses . . . owned or controlled directly or indirectly by the same interests." *Id*. § 482. Specifically, the shareholders of an export corporation could create a commonly controlled FSC and then make "sale[s] of export property" to the FSC at *hypothetical* "transfer price[s]" that were fixed by a complex statutory formula "regardless of the sales price actually charged." *Id*. § 925(a). As with the DISC system, the FSC statute required the Secretary to issue regulations that would establish comparable rules "in the case of commissions, rentals, and other income," *id*. § 925(b)(1), and the Secretary did so, *see*, *e.g.*, 26 C.F.R. § 1.925(a)-1T(d)(2). Similar to their DISC counterparts, these regulations set forth specific instructions for calculating the "maximum commission the FSC may charge" the export corporation and the "amount of the income that may be earned by the FSC in any year." *Id*. § 1.925(a)-1T(d)(2)(ii), (iv). Once again, the details of these formulas are not relevant here. What matters is that the formulas allowed the FSC's commissions and income to be set at artificial levels that did not necessarily correspond to the actual value of any services provided by the FSC. *See id*. § 1.925(a)-1T(a)(3) (application of certain pricing rules

---

[5] There appears to be some debate as to whether the phrase should be "a FSC" (which assumes that the term is pronounced "a Fisc") or should instead be "an FSC" (which assumes that it is pronounced "an F-S-C"). We follow the statute, which consistently uses the phrase "a FSC." *See*, *e.g.*, I.R.C. § 921(a).

"does not depend on the extent to which the FSC performs substantial economic functions beyond those required by section 925(c)").

In contrast to a DISC, whose income is generally exempt from tax, *see* I.R.C. § 991, a FSC's income was *partially* subject to tax. Specifically, after an export company paid tax-deductible commissions to its related FSC, a statutorily specified *portion* of the FSC's income attributable to those commissions was declared to be "exempt foreign trade income." *Id*. § 923(a)(1); *see also id*. §§ 923(b), 924(a). The statute stated, in turn, that "[e]xempt foreign trade income" would be "treated as foreign source income which is not effectively connected with the conduct of a trade or business within the United States," thereby exempting such income from taxation. *Id*. § 921(a).[6] The remaining non-exempt portion of the FSC's foreign trade income, however, was still subject to the corporate income tax rate. The net effect of these provisions was to allow an export corporation to allocate a portion of its export sales income to the FSC by paying the FSC artificially determined "commissions," with the consequence that the export corporation paid no income tax on any of the commissions (which it deducted as an expense) and the FSC paid income tax only on the non-exempt portion of its income attributable to those commissions.

---

[6] To take advantage of these rules, a FSC generally had to be managed, and transact its business, outside the United States. I.R.C. § 924(b)(1), (c), (d). However, those requirements generally did not apply to a "small FSC," *id*. § 924(b)(2)(A), as that term was defined by statute, *id*. § 922(b). It is undisputed that the relevant FSC in this case was a "small FSC," and it therefore was not subject to these additional requirements.

The taxation of a FSC's dividend payments differs in some respects from those of a DISC. Dividends that are distributed by a FSC to a domestic parent corporation out of the earnings and profits attributable to the FSC's foreign trade income are generally *not* subject to corporate income tax. I.R.C. § 245(c)(1)(A). This allowed the export corporation to effectively allocate income to the FSC, where it was subject to reduced taxation, and then to receive back some of those funds as dividends without paying income tax on them. The Commissioner estimates that the bottom-line result of these complex rules was to allow "a U.S. manufacturer to reduce its corporate income tax on export sales by approximately 15%."

If the FSC paid dividends to *individual* shareholders, then those dividends would generally be subject to taxation under the default rule that dividends are treated as income. *See* I.R.C. § 1(h)(11). By contrast, if an IRA was the shareholder of the FSC, then any FSC dividend received by the IRA, like almost any other income to the IRA, is exempt from taxation. *See id*. § 408(e)(1). Although the general rule against taxation of IRA income does not apply to "unrelated business income" that is taxed under § 511, *see id*. § 408(e)(1), the default rule under the Code is that dividends are *excluded* from "unrelated business taxable income," *id*. § 512(a)(1), (b)(1). As noted earlier, *see supra* at 11–12, the Code contains a special provision that expressly *reverses* that default rule in the case of dividends paid by "a DISC" to a tax-exempt entity (such as an IRA), *see id*. § 995(g), and that means that an IRA must pay tax on such "unrelated business income" under § 511, *see id*. § 408(e)(1). But the Code contains no such similar provision with respect to dividends of *a FSC* that are paid to a tax-exempt shareholder, such as an IRA, and so the default rule remains in place. And if the IRA that owned the FSC shares was a *Roth* IRA, as

opposed to a traditional IRA, then the authorized distributions from the IRA to the individual holder of the account would not be taxed either. The net result of having a Roth IRA hold the shares of a FSC would thus be that (1) the export corporation would pay no tax on the income it allocated as "commissions" to the FSC; (2) the FSC would pay only a reduced level of corporate income tax on the income attributable to its commissions; (3) the Roth IRA would pay no tax when it received dividends from the FSC; and (4) the individual IRA holder would pay no tax when receiving the FSC dividends in the form of authorized IRA distributions. That is, only one of these four transactions would be taxable and that one only at a reduced effective rate.

## B

With this complex statutory background in place, we can now turn to the facts of this case. We first describe the Mazzeis' relevant transactions and then recount the proceedings below.

## 1

In 1977, Angelo Mazzei filed a patent application for an "injector" that added fertilizers to the water used in agricultural irrigation systems. The following year, recognizing the business potential in his invention, Angelo and his wife Mary Mazzei formed the Mazzei Injector Corp. ("Injector Corp.") as an S corporation.[7] Angelo and Mary

---

[7] "S corporations" are ordinary business corporations that elect to pass corporate income, losses, deductions, and credits through to their individual shareholders for federal tax purposes. *See* I.R.C. §§ 1361–1379. Thus, the S corporation generally pays no income tax, and the shareholders of S corporations instead report the flow-through of income

thereafter actively ran the business, although Mary later reduced her role. Once their daughter, Celia, graduated from college, she became more active in the company and served as its vice president of research and development. During the time period at issue in this case, Angelo and Mary each owned 45 percent of Injector Corp. while Celia owned the remaining 10 percent. Through the Mazzeis' efforts, Injector Corp. grew rapidly, and by 1984, the business began exporting its products through foreign distributors. By the late 1990s, export sales provided a steady stream of revenue to Injector Corp.

The Mazzeis also owned a 20-acre farm, and as a result they were long-time members of the Western Growers Association ("WGA"), a trade association representing farmers. In the 1990s, WGA developed a program for its members that would facilitate their use of FSCs, and in 1998 the Mazzeis decided to participate in that program. In connection with doing so, the Mazzeis took steps to set up Roth IRAs. The amount that may be contributed to a Roth IRA is determined according to a statutory formula, *see* I.R.C. § 408A(c), and for the years prior to 1998, each of the Mazzeis' contribution limits to a Roth IRA was zero. Through a complex business restructuring that the Commissioner does not challenge here, each of the Mazzeis had a Roth IRA contribution limit of $2,000 for 1998 only. Under that restructuring, the Mazzeis formed another S corporation, ALM Corp., which was owned in the same proportions as Injector Corp. ALM Corp. and Injector

---

and losses on their personal tax returns and pay tax at their individual income tax rates. *Id*. §§ 1363(a), 1366. In this way, S corporations avoid the problem of double taxation in which the corporation would first pay tax on its income and then the individual shareholder would pay tax on distributions received from the corporation.

Corp., in turn, then formed Mazzei Injector Co. ("Injector Co."), an LLC that was treated as a partnership for tax purposes. Having secured a Roth IRA contribution limit of $2,000 for 1998, each of the Mazzeis opened a Roth IRA and contributed $2,000. However, in the ensuing four calendar years (1999 through 2002), the Roth IRA contribution limits for each of the Mazzeis reverted back to zero.

Meanwhile, the newly formed entity, Injector Co., applied to join WGA's FSC program. Once WGA approved Injector Co.'s application, the Mazzeis took steps to establish a FSC under WGA's auspices. The WGA FSC program took advantage of the statute's allowance of a "shared FSC," under which an entity (such as WGA) could arrange for a FSC to maintain "separate account[s]" that each would then generally "be treated as a separate corporation for purposes" of the FSC statute. I.R.C. § 927(g)(1), (g)(3)(A). In formally establishing their FSC as a separate account in one of WGA's shared FSCs, the Mazzeis arranged for their separate Roth IRAs to each purchase 33⅓ shares of their FSC, at a total price of $500 for the 100 shares. The Mazzeis also elected to have their FSC treated as a "small FSC," which meant that it was not subject to the same foreign-presence requirements as regular FSCs. *See supra* note 6.

WGA also provided Injector Co. with drafts of the various agreements that would be needed to ensure that its FSC—which was ultimately a separate account in the "Western Growers Shared Foreign Sales Corporation IV Ltd." ("WG FSC IV")[8]—would be able to operate as

---

[8] The relevant shared FSC was originally "Western Growers Shared Foreign Sales Corporation III Ltd.," but because the change makes no difference here, we will refer only to "WG FSC IV." And because

intended, and Injector Co. executed these agreements in early 1998. These various agreements underscore what the statutory framework expressly contemplates, which is that the FSC would be paid commissions that were set according to regulatory formulas and that did not reflect any actual services provided by the FSC.

First, Injector Co. and WG FSC IV executed a "Foreign Trade Commission, Sale, License, Lease and Services Agreement" ("Commission Agreement"), under which WG FSC IV agreed to perform certain activities and services for Injector Co. "but *only* to the extent it can delegate such activities and services" *back* to Injector Co. "and is not required to use its own assets and/or personnel to perform such activities and services" (emphasis added). Thus, for example, WG FSC IV agreed to "promote the license, lease and sale" of Injector Co.'s products, but it also stated that *none* of these activities "shall be of the type which involve the use of the FSC's own assets or personnel to perform such activities." The Commission Agreement also specified that if a particular sale, license, or lease was "*considered* as solicited or promoted" by WG FSC IV, then the FSC would receive a commission, but that Injector Co. would have the "final decision" as to whether the FSC was to be "considered as having solicited or promoted a transaction" (emphasis added). If a commission was to be paid, then it would be determined by mutual agreement in accordance with the formulas in the applicable federal FSC regulations "so as to provide the maximum federal income tax benefits" to Injector Co. Likewise, the Commission Agreement specified that if *Injector Co.* "performs any service for a

―――――――――――

nothing turns on the distinction here, we will also for the sake of simplicity use "WG FSC IV" interchangeably to refer to both the shared FSC and the Mazzeis' separate account within that shared FSC.

customer that would constitute" a relevant service "if performed by [WG FSC IV] for a customer considered as solicited or promoted" by the FSC, then Injector Co. would pay a "commission" to the FSC. Once again, Injector Co. had the "final decision" as to whether WG FSC IV would be "considered" to have solicited or promoted a transaction, and any commission paid would be determined by mutual agreement in accordance with the relevant regulatory formulas.

Second, consistent with what was expressly contemplated in the Commission Agreement, the "Export Related Services Agreement" ("Services Agreement") formally delegated back to Injector Co. the relevant activities and services that WG FSC IV was to perform in connection with "earning foreign trade income." WG FSC IV agreed to pay Injector Co. a "service fee" for performing these services, but any such fee could not exceed the commissions that the FSC received and was to be "immediately offset against the discretionary commissions which [Injector Co.] would otherwise pay to [the FSC]." The agreement further provided that services would be deemed to have been performed by Injector Co. for WG FSA IV only to the extent required to "maxim[ize] federal income tax benefits."

Third, under the "Management Contract," WG FSC IV agreed to pay "administrative fees" to Quail Street Management ("Quail Street"), the Bermuda-based management company that administered WGA's FSC program. The fee was set at 0.1 percent of the FSC's foreign gross trading receipts as defined in Internal Revenue Code § 924. The fee had to be at least $3,500 and at most $10,000.

Fourth, under the "Shareholders' Agreement," each IRA shareholder owned one-third of their FSC's 100 shares,

which could not be sold without the approval of the FSC's directors. The agreement confirmed the $500 purchase price for the 100 shares and specified that this amount consisted of $1 of "paid-in capital" and $499 of "paid-in surplus." The agreement further stated that, in the event that the FSC exercised its right to purchase the FSC stock from the shareholders, the purchase price would be the paid-in-capital amount ($1). However, the agreement specified that this right of purchase did not apply in the case of an "IRA Shareholder" and that any such sale by an IRA Shareholder to the FSC was prohibited.

With these agreements in place, Injector Co. thereafter reported its foreign sales to Quail Street each quarter. Based on these numbers, Quail Street computed the maximum commission that Injector Co. was allowed to pay to the FSC in accordance with the federal FSC regulatory formulas. Quail Street then reported that amount in letters to the Mazzeis that identified (1) the amount of the FSC tax that had been paid (and that had to be reimbursed);[9] and (2) the remainder amount that could be distributed to the IRA shareholders. In accordance with these instructions, Injector Co. paid a total of $558,555 in commissions and taxes to WG FSC IV between 1998 and March 2002. In turn, the FSC paid $533,057 in dividends to the Mazzeis' Roth IRAs over that same time period.

---

[9] As explained earlier, only a portion of the commissions received by a FSC are untaxed, *see supra* at 15, and so the FSC here paid tax on a portion of Injector Co.'s payments and distributed the rest to the Mazzeis' Roth IRAs. The Roth IRAs did not pay tax on these FSC dividends, but had the dividends instead been paid to the Mazzeis individually, they would have owed tax on the dividends. *See supra* at 16.

Through these various steps, the Mazzeis took full advantage of the tax benefits described earlier. *See supra* at 17. The corporations that generated the foreign sales ultimately benefitted from a tax deduction for the "commissions" paid to the FSC. WG FSC IV paid a modest amount of tax on the income attributable to its commissions. The Roth IRAs paid no tax on the substantial dividends they received from the FSC because (unlike § 995(g) in the case of a DISC) there is no statutory provision imposing such a tax in the case of a FSC. And, now that the funds are safely in the Roth IRAs, they can be withdrawn by the Mazzeis tax free when they are eligible to make such withdrawals.

**2**

Unsurprisingly, the Commissioner did not like this arrangement. On April 6, 2009, the Commissioner served notices of deficiency against each of the Mazzeis. The Commissioner asserted that the $533,057 that had been paid by WG FSC IV into their respective Roth IRAs should be deemed, in substance, to be *contributions* to their Roth IRAs that exceeded their statutory contribution limits. For tax years 2002 through 2007, the Commissioner asserted excise tax deficiencies against Angelo and Mary (who filed joint returns) in the amount of $67,590, as well as penalties totaling $19,215.[10] For tax years 2002 through 2007, the Commissioner asserted against Celia excise tax deficiencies of $40,692 and penalties totaling $11,912. All three petitioned the Tax Court for a redetermination of the deficiency in tax, and the cases were consolidated.

---

[10] The penalties were imposed for failing to timely file a tax return, *see* I.R.C. § 6651(a)(1), and for failing to timely pay the tax shown on a return, *see id*. § 6651(a)(2).

The consolidated case was tried on November 20, 2014 before Judge Mark Holmes.  After Judge Holmes circulated his proposed opinion within the Tax Court, the full Tax Court determined to decide the matter.  *See* I.R.C. § 7460(b); *see also Mazzei v. Commissioner*, 150 T.C. 138, 184 n.1 (2018) (Holmes, J., dissenting).  The Tax Court ultimately upheld the Commissioner's assessment of excise taxes against the Mazzeis by a vote of 12 to 4 (with Judge Holmes dissenting), but the Tax Court unanimously set aside all of the penalties.  *Mazzei*, 150 T.C. at 168, 182.  Invoking the doctrine of substance over form, the Tax Court concluded that the Roth IRAs' purchase of the FSC stock did not reflect "the underlying reality" because the "Roth IRAs effectively paid nothing for the FSC stock, put nothing at risk, and from an objective perspective, could not have expected any benefits" from that ownership.  *See id*. at 167–68.  The court therefore "disregard[ed] the purchase" and treated the Mazzeis as "the owners of the FSC stock for Federal tax purposes at all relevant times."  *Id*. at 168.  That meant that the payments from the FSC must be "recharacterized as dividends from the FSC" *to the Mazzeis*.[11]  *Id*.  And that meant that the payments into the Roth IRAs were made by the Mazzeis and were, therefore, excess contributions to the Roth IRAs by the Mazzeis.  *Id*.

The dissenters disagreed, asserting that the majority had overlooked the import of the special rules that governed FSCs, which expressly allowed transactions between commonly held entities that lacked economic substance.  In

---

[11] The logic of the Tax Court's reasoning would suggest that the Mazzeis should have paid income taxes on those dividends.  *See supra* at 16.  But as the Tax Court noted, "any income tax issues from 1998–2001 are barred" by the "statute of limitations" in I.R.C. § 6501.  *See* 150 T.C. at 149 n.15.

particular, the dissenters questioned the majority's conclusion that, because the Roth IRAs had "paid so little" for their FSC stock and had put nothing at risk, they could not be the true owners of the FSC. 150 T.C. at 192–93 (Holmes, J., dissenting). As the dissent explained, "the Mazzeis also put nothing at risk to get the FSC, so by the majority's reasoning they couldn't have owned the FSC either." *Id*. at 193. Indeed, the dissenters argued that, under a consistent application of the majority's reasoning, "no one could ever own an FSC because FSCs never put capital at risk." *Id*.

The Mazzeis filed a motion for reconsideration and a motion to vacate, which the Tax Court denied. The Mazzeis timely appealed to this court.

## II

In addressing the parties' contentions on appeal, we begin by identifying several points that are not in dispute. In particular, the Commissioner does not contend that the Mazzeis failed to follow any of the formalities required by the Internal Revenue Code concerning the FSC or their Roth IRAs. On the contrary, the Commissioner stipulated at trial that WG FSC IV met all of the requirements for a small FSC; that the Mazzeis' Roth IRAs were properly established under the Code; that there had not been a prohibited transaction involving the Roth IRAs within the meaning of I.R.C. § 4975; and that compliance with I.R.C. § 482—which (as noted earlier, *see supra* at 14) addresses allocation of income and deductions among commonly controlled entities—was "not at issue in this case." Nor has the Commissioner contended that any commissions that Injector Co. paid to the FSC were calculated incorrectly under the applicable statutory and regulatory formulas. *See Mazzei*, 150 T.C. at 175.

Rather than contest whether the Mazzeis followed the letter of the Code, the Commissioner instead asked the Tax Court to "'recharacterize [the Mazzeis'] entire scheme'" under the "doctrine of substance over form." *See* 150 T.C. at 150. The Tax Court, however, expressly rejected the Commissioner's "request for a complete recharacterization of all [of the Mazzeis'] transactions," *id*. at 151, and the Commissioner has not challenged that ruling in this court. Instead, the Tax Court recharacterized only *one* of the transactions at issue, *viz*., the purchase of the FSC's stock by the Roth IRAs. *Id*. Accordingly, the only issue before us is whether the Tax Court properly concluded that, under the substance-over-form doctrine, the Mazzeis, rather than their Roth IRAs, were the owners of the FSC for federal tax purposes.

We review the Tax Court's decision "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." I.R.C. § 7482(a)(1). "We review questions of fact for clear error." *Knudsen v. Commissioner*, 793 F.3d 1030, 1033 (9th Cir. 2015). "We review the Tax Court's conclusions of law, including its interpretations of the Internal Revenue Code, *de novo*." *Id*. "The general characterization of a transaction for tax purposes is a question of law" subject to de novo review. *Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978); *see also Sacks v. Commissioner*, 69 F.3d 982, 986 (9th Cir. 1995).

## A

It is a "black-letter principle" that, in construing and applying the tax laws, courts generally "follow substance over form." *PPL Corp. v. Commissioner*, 569 U.S. 329, 340 (2013); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 317–18 (2009) ("[I]t is well settled that in reading regulatory

and taxation statutes, 'form should be disregarded for substance and the emphasis should be on economic reality.'" (citation omitted)).  Indeed, quoting Professor Boris Bittker, we have described this "substance-over-form doctrine" and other related doctrines as resembling, in combination, a sort of "'preamble to the Code, describing the framework within which all statutory provisions are to function.'" *Stewart v. Commissioner*, 714 F.2d 977, 987–88 (9th Cir. 1983) (quoting Boris I. Bittker, *Pervasive Judicial Doctrines in the Construction of the Internal Revenue Code*, 21 How. L.J. 693, 695 (1978)).    Under these settled background principles, this would be an easy case if it involved ordinary business entities, as opposed to the distinctive vehicle of a FSC.    The taxpayers used what is essentially a shell corporation to engage in arbitrarily priced, self-dealing transactions that lacked economic substance and then funneled those proceeds as "dividends" to a tax-free Roth IRA.  This would appear to present a paradigmatic case to apply such doctrines.  *Cf.*, *e.g.*, *Repetto v. Commissioner*, 103 T.C.M. (CCH) 1895, 2012 WL 2160440, at *9–12 (2012) (invoking substance-over-form doctrine where two Roth IRAs respectively received dividends from commonly controlled C corporations that received "service" payments without themselves actually performing any business services).

But like any background maxim that informs the construction and application of a statute, the doctrine of substance over form can be negated by Congress in express statutory language.  *See Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001) (interpretive "canons are not mandatory rules" and "other circumstances evidencing congressional intent can overcome their force").  Thus, there are some circumstances "'when form—and form alone— determines the tax consequences of a transaction,'" *Stewart*,

714 F.2d at 988 (citation omitted), such as when "statutory provisions deliberately elevate, or have been construed to elevate, form above substance," *see* 1 Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estate and Gifts ¶ 4.3.3, at 4-34 (3d ed. 1999). This is such a case. As we have set forth in detail above, Congress has expressly decreed that FSCs can engage in transactions, with commonly controlled entities, that lack any economic substance and that are assigned hypothetical values determined according to statutory formulas that bear no relationship to any underlying real-world valuation. *See supra* at 13–15. Indeed, as this case well illustrates, the entire FSC need not have any substance to it because it can "contract" for another related entity to perform its relevant activities. *See* I.R.C. § 925(c); *see also* 26 C.F.R. § 1.925(a)-1T(a)(3) (application of the relevant valuation formulas "does not depend on the extent to which the FSC performs substantial economic functions beyond those required by section 925(c)"); *Mazzei*, 150 T.C. at 157 (noting that, under the FSC regime, a "related supplier was permitted to pay the FSC a 'commission' for services (relating to an export transaction) that were not, in substance, performed by the FSC (although the FSC could perform such services if it wished)"). Put simply, the FSC statute expressly contemplates that, without itself performing any services, a FSC can receive "commissions" from a related entity and then (after paying a reduced level of tax) the FSC can pay the remainder as dividends to the same or another related entity. Under the scheme that Congress devised in the FSC statute, the taxation rules in certain respects plainly follow the *form* of the matter and not its substance.

The question in this case, then, is whether the Tax Court applied the substance-over-form doctrine in a manner that properly takes account of Congress's limited abrogation of

that doctrine here.  The Tax Court construed that abrogation very narrowly, saying that Congress endorsed form over substance *only* with respect to the "specific transactions" in which the export company pays commissions based on statutory formulas that lack any economic reality, and then "*only* for the purpose of computing the income taxes of the FSC and its related supplier." *See Mazzei*, 150 T.C. at 159 (emphasis added).  Beyond that, the Tax Court concluded, the FSC statute left the substance-over-form doctrine intact.  As that court stated, "[n]o part of the FSC statutes and regulations states, or even implies, that purchases or transfers of FSC stock, or any transactions at the shareholder level or between the FSC and its owners, are exempt from application of the substance doctrines, which are our normal tools of statutory interpretation."  *Id*. at 160 (simplified).  The Tax Court therefore held that the FSC statute's partial abrogation of substance-over-form principles did *not* apply "in deciding who actually owned the FSC stock" and that that question was therefore governed by "normal substance principles."  *Id*. at 154.  While we share the Tax Court's concern that exemptions from normal substance-over-form rules should not be read overly broadly, we cannot agree with that court's extremely restrictive view of the exemption reflected in the FSC statute.  In our view, the Tax Court's invocation of the substance-over-form doctrine in this case rests on subsidiary premises that cannot be reconciled with what Congress has decreed with respect to FSCs.

## B

### 1

In applying normal substance-over-form principles to the issue of the ownership of WG FSC IV, the Tax Court considered whether the stockholders—*i.e.*, the Roth IRAs—had "the benefits and risks of ownership," or whether some

other entity possessed them. 150 T.C. at 163. The court
noted that the Roth IRAs had put essentially nothing at risk
because the $500 "prearranged" price they paid for the FSC
stock bore no "relationship to the actual value" of that stock.
*Id*. at 165. The court concluded that the $500 the Roth IRAs
paid thus "represented at most a de minimis risk which was
insufficient to give substance to the Roth IRAs' purported
ownership of the FSC stock."[12] *Id*. at 164. The Tax Court
also addressed "what benefits an independent holder of the
FSC stock could realistically have expected on the basis of
the 'objective nature' of the FSC stock," and the court
concluded that there were none: because "Injector Co.
retained complete control over whether any of its export
receipts would flow to the FSC in any year," it followed that
"no independent holder of the FSC stock could realistically
have expected to receive any benefits (before or after tax)
due to its formal ownership of the FSC stock." *Id*. at 166–
67. Because the Roth IRAs thus lacked the risks and benefits
of ownership, the court "disregard[ed]" their purchase of the
FSC stock. *Id*. at 168. Instead, the court concluded, the
Mazzeis (through Injector Co.) were the true owners of the
FSC. *Id*. And that meant that, under *Commissioner v.*

---

[12] Indeed, the Tax Court suggested that, despite the parties'
agreement that the total stock was worth "$100 when it was purchased,"
the actual value was only $1 because that was the sale price set forth in
the Shareholders' Agreement in the event that the shareholders sold their
stock. *Mazzei*, 150 T.C. at 165. The rest of the purchase price, according
to the Tax Court, was simply a fee to WGA. *Id*. This analysis appears
to overlook the fact that the $1 mandatory sale price, by its terms, only
applied to a purchase of the stock *by WG FSC IV* and that this option to
purchase did *not* apply if (as here) the stock was owned by an IRA.
Although a sale of the stock by the Roth IRAs to some other party would
still have required the approval of WG FSC IV's directors, the agreement
does not appear to specify a price in such circumstances. In all events,
our analysis does not depend upon whether the value of the FSC stock at
the time of purchase was $1, $100, or $500.

*Banks*, 543 U.S. 426 (2005), the income of the FSC that was paid out as dividends was, in the view of the Tax Court, received by *the Mazzeis* for tax purposes. *Mazzei*, 150 T.C. at 160–61 ("'In an ordinary case attribution of income is resolved by asking whether a taxpayer exercises complete dominion over the income in question.'" (quoting *Banks*, 543 U.S. at 434)).

The problem with this analysis is that its underlying premises are directly contrary to what is expressly contemplated by the FSC statute. It makes no sense to ask whether the formal owner of the FSC stock would, by virtue of that purchase, be exposed to any risk as a result of that ownership because the statute allows FSCs to be set up so as to eliminate any risk from owning the FSC stock. Specifically, the statute explicitly authorizes the establishment of a FSC that will not conduct any operations itself, and in such cases the FSC will effectively be a shell corporation that generates value only by virtue of the reduced rate of taxation that is paid on moneys that are funneled through it in accordance with strict statutory formulas. *See supra* at 13–17, 27–28. Such a shell corporation presents little, if any, risk at all to its owner because it will be used *only* if and when there is value (in the form of tax savings) to be obtained by flowing funds through it.

The Tax Court discounted this point, noting that "nothing in the Code *prevents* an FSC shareholder from capitalizing its FSC," and such capital could be at risk. *Mazzei*, 150 T.C. at 164 n.36 (emphasis added). This is an ironic comment to make in an analysis that is supposedly focused on economic realities. The reality is that, for a FSC to function as the statute contemplates, there must be related parties on *both* sides of the FSC, because the whole point of

the FSC vehicle is to cycle money through it so that it is taxed at the FSC's lower rate. The statute clearly envisions that the parties who pay money *into* the FSC and the parties who receive dividends *out* of it will be related.**[13]** Given that reality, it would not make much economic sense to "capitalize" the FSC with more than a nominal amount of capital. As the dissenters noted, taking the Tax Court's analysis seriously would lead to the illogical conclusion that "no one could ever own an FSC" because no owner would ever "put capital at risk" in the FSC. *Id*. at 193 (Holmes, J., dissenting). The Tax Court also claimed that the Mazzeis (unlike the Roth IRAs) *did* have risk because they were "exposed at all times" to the risk "that their investment in their export business would decline." *Id*. at 165 n.37 (majority opinion). But this is the risk that the Mazzeis faced as the owners of *Injector Co.*; it is *not* a risk that they would face as the owners of the FSC.

Moreover, it makes even less sense to ask, as the Tax Court did, "what benefits an *independent* holder of the FSC stock could realistically have expected." 150 T.C. at 166 (emphasis added). By statutory design, a FSC typically will *not* be owned by an "independent" entity; it will be owned by "a person described in section 482," I.R.C. § 925(a)— *viz*., an entity "owned or controlled directly or indirectly *by the same interests*," *id*. § 482 (emphasis added). As we have explained, the tax benefits associated with the FSC regime contemplate *related* entities on both sides of the FSC. *See supra* at 14, 31–32. As a result, no "independent" person would realistically be expected to obtain value from owning

---

**[13]** One possible exception might be a scenario in which the FSC is effectively used to make a gift to a third party. *Cf. Benenson*, 910 F.3d at 696 n.5. We express no view on how the Code and regulations would apply in such a distinct scenario.

an FSC because a foreign exporter would have no practical incentive to choose to pour money into such a FSC.[14]

For similar reasons, the Tax Court's reliance on the "anticipatory assignment doctrine" discussed in *Banks*, 543 U.S. at 434, is also flawed. That doctrine states that, as a general matter, "gains should be taxed 'to those who earned them,'" so that a "taxpayer cannot exclude an economic gain from gross income by assigning the gain in advance to another party." *Id*. at 433 (citation omitted). The FSC regime explicitly departs from that principle as well because the key feature of the FSC mechanism is that the relevant income earned by the export company is instead funneled to the FSC—which did not earn it—and it is then taxed at the FSC level (rather than the export company level) before then being cycled back out to a related entity.[15] Application of the anticipatory assignment doctrine here would mean that Injector Co., rather than the FSC, should be treated as the earner of the income, all of which was produced by Injector Co.'s efforts. Such an outcome, of course, is directly contrary to the scheme of the FSC statute. The Tax Court sought to side-step this problem by

[14] Moreover, in treating the Roth IRA ownership as illusory, the Tax Court overlooked that there are real-world consequences to the fact that the Roth IRAs own the FSC rather than Injector Co. or the Mazzeis. Although there are certainly tax advantages to that arrangement, one consequence of that ownership is that the moneys distributed by the FSC to the Roth IRAs as dividends could not be withdrawn without penalty unless and until the respective owner is eligible to make qualified withdrawals. For a younger individual such a Celia Mazzei, that is not an insignificant limitation.

[15] As noted earlier, if the related entity that received the money on the return trip is taxed as a corporation, then it typically pays no tax on those dividends when they are received from the FSC. *See* I.R.C. § 245(c)(1)(A); *supra* at 16.

characterizing *the FSC* as the generator of the income, *see Mazzei*, 150 T.C. at 161, but of course the FSC *did* pay tax on its income. The court purported to treat the *dividends* as the relevant income, *see id*., but that approach—which asks who controls the assignment of the FSC's dividends—simply begs the earlier-addressed question of who owns the FSC.

Accordingly, the Tax Court's application of substance-over-form principles in determining who owned the FSC in this case rested critically on subsidiary premises that directly conflict with the very features of the FSC regime that explicitly *depart* from such principles. The court therefore erred in invoking such principles to set aside the Roth IRAs' formal ownership of the FSC's shares.

**2**

This conclusion is reinforced by two further textual clues in the language of the FSC statute.

First, as noted earlier, the special hypothetical valuation formulas contained in the FSC statute are an express exception to the allocation rules that would otherwise govern under § 482 of the Code, and the statute thus expressly contemplates that a FSC will ordinarily receive its funds from "a person described in section 482," I.R.C. § 925(a)—*viz*., an entity "owned or controlled directly or indirectly *by the same interests*," *id*. § 482 (emphasis added). Because the FSC statute waives the normal rules with respect to *any* "person described in section 482," the statute applies its special rules regardless of *which* related entity owns it. *Id*. § 925(a). The Tax Court's reasoning, however, effectively rewrites this provision as if it required *the export company* that funnels money *into* the FSC to be the one that owns it and that therefore would receive the dividends *out* of it. But

nothing in the statute imposes such a requirement, and the text of § 925(a) negates it.

Second, Congress is obviously aware that tax-free entities, including IRAs, can own a FSC because the FSC was modeled on the DISC and Congress added a provision to specifically address that scenario only in the DISC context. The DISC and FSC statutes use identical language in waiving the normal allocation rules that would apply to the DISC or FSC in a transaction with "a person described in section 482," and both statutes therefore contemplate that a variety of related entities might be the holder of the DISC or FSC stock, including tax-exempt entities like IRAs. *Compare* I.R.C. § 925(a) *with id*. § 994(a). But as noted earlier, Congress in 1988 enacted a special provision stating that, if a tax-exempt entity (such as an IRA) owns shares *in a DISC*, then any dividends distributed, or deemed distributed, to the IRA are generally "treated as derived from the conduct of an unrelated trade or business," *see id*. § 995(g), and therefore subject to taxation under § 511. *See supra* at 11. Congress, however, did *not* add a similar feature to the then-existing FSC statute that would similarly tax dividends received by a tax-exempt entity that owns shares *of a FSC*. Congress could have taken similar steps either to impose a tax on dividends received by tax-exempt entities from a FSC or to prohibit FSC ownership by such entities altogether, but Congress must be deemed to have chosen not to do so. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (simplified)). That may have been unwise, but we cannot rewrite the Code to impose an effective ban on

FSC ownership by Roth IRAs, which is essentially what the Commissioner has asked us to do here.

## 3

Finally, our conclusion is supported by the decisions of the First, Second, and Sixth Circuits in three appeals arising from a single Tax Court proceeding involving a Roth IRA that indirectly owned shares in a DISC.

In *Summa Holdings, Inc. v. Commissioner*, 109 T.C.M. (CCH) 1612, 2015 WL 3943219 (2015), James Benenson, Jr. ("James Jr.") and Sharen Benenson were the trustees of a trust (the "Benenson Trust") for which their two sons ("James III" and Clement) were the beneficiaries. 2015 WL 3943219, at \*1. The Benenson Trust, together with James Jr., owned most of the shares of Summa Holdings, a company whose subsidiaries had significant export sales. *Id*. at \*1–2. James III and Clement established Roth IRAs, which ultimately became equal shareholders in JC Holding, a C corporation, which in turn owned JC Export, a DISC. *Id*. Through a series of agreements with Summa subsidiaries, JC Export received commissions from those subsidiaries in accordance with the statutory formulas applicable to DISCs. *Id*. at \*2. JC Export then paid out the sums it received as dividends to JC Holding, and that company, as a C corporation, paid corporate tax on those sums. *Id*. After withholding that estimated tax, JC Holding then distributed the remainder equally as a dividend to James III's and Clement's Roth IRAs. *Id*. The Commissioner issued deficiency notices to several of the taxpayers involved, and the Tax Court ultimately relied on substance-over-form principles in concluding that the payments made by the Summa subsidiaries to JC Export "were not DISC commissions but deemed dividends to Summa's shareholders followed by contributions to the Benenson

Roth IRAs." *Id*. at *8.  As a result, Summa's deduction of those commissions was disallowed; James Jr. and the Benenson Trust were found to have failed to report these "deemed" dividends as income; and James III and Clement owed excise taxes on the excess contributions to their Roth IRAs. *Id*. at *4, *9.  These taxpayers each appealed to their respective circuit courts—Summa to the Sixth Circuit; James Jr. and Sharen (the trustees of the Benenson Trust) to the Second Circuit; and James III and Clement to the First Circuit.  All three circuits ruled against the Commissioner.

None of these decisions addressed the exact question presented here, but the First Circuit's decision comes closest. That court addressed the Commissioner's claim that the dividends received by the Benenson sons' Roth IRAs should be characterized as contributions in excess of the applicable limits.  *Benenson v. Commissioner*, 887 F.3d 511, 516–22 (1st Cir. 2018).  The First Circuit distinguished the Tax Court's decision in the Mazzeis' case on the grounds that, in the Benenson case, the Commissioner had "never challenged the valuation of the shares the Roth IRAs purchased."  *Id*. at 522; *see also id*. at 522 n.10.  But in rejecting the Commissioner's recharacterization of the transaction, the First Circuit nonetheless went on to make several points that are directly relevant to our analysis.  Specifically, the First Circuit held that, in light of the Code provisions governing taxation of DISC dividends paid to C corporations and to tax-exempt entities, Congress had clearly permitted such entities to own DISCs and to receive DISC dividends.  *Id*. at 520–21.  This recognition that Congress is aware that Roth IRAs and C corporations can own DISCs likewise applies in the FSC context.  *See supra* at 35–36.

Moreover, the First Circuit held that it did not matter that the dividends ultimately received by the Roth IRAs greatly

exceeded any risk to the direct and indirect shareholders of the DISC. As the court explained, the Code provisions governing IRAs plainly allow the funds in an IRA "to grow through investment in qualified privately held companies, even during periods where the taxpayers are no longer allowed to contribute, *and even if such growth occurs at a swift rate*." *Benenson*, 887 F.3d at 520 (emphasis added). And in response to the Commissioner's complaint that this enormous return was for an investment in the DISC that involved "no risk" to the Roth IRAs, the First Circuit noted that this was "due to the unique, congressionally designed DISC corporate form." *Id*. at 522. The same reasoning supports our earlier conclusion that, because a similar lack of risk is inherent in the "unique, congressionally designed [FSC] corporate form," the Commissioner may not invoke that congressionally sanctioned feature as a basis for attacking the ownership structure of the FSC. *See supra* at 29.

Although less directly relevant, the decisions of the Sixth and Second Circuits in the Benensons' case are also consistent with our holding. The appeals in these two circuits involved different taxpayers (Summa in the Sixth Circuit and James Jr. and Sharen in the Second Circuit), but the underlying issue in both cases was the same—*viz*., whether the commissions paid by the Summa subsidiaries to the DISC were properly recharacterized, under the substance-over-form doctrine, as dividends to Summa's shareholders. Both courts answered that question in the negative. Underscoring the core point we have made here, the Second Circuit held that the Commissioner's effort to invoke the substance-over-form doctrine to recharacterize the commissions to the DISC ignored the fact that "Congress has itself elevated form over substance insofar as DISC commissions are concerned by affording exporters

'commission' deductions for payments that lack the economic substance generally associated with commissions." *Benenson*, 910 F.3d at 700. And the Sixth Circuit likewise noted that the Commissioner's reliance on the doctrine could not be reconciled with the fact that the "Code authorizes companies to create DISCs as shell corporations that can receive commissions and pay dividends that have no economic substance at all." *Summa Holdings*, 848 F.3d at 786; *see also id.* ("By congressional design, DISCs are all form and no substance . . . .").

We join our sister circuits in concluding that, when Congress expressly departs from substance-over-form principles, the Commissioner may not invoke those principles in a way that would directly reverse that congressional judgment.

## III

As the First Circuit noted in the *Benenson* case, some might think that what the Mazzeis did here was too "clever," if not "unseemly." 887 F.3d at 523. But as that court noted, the substance-over-form doctrine "is not a smell test," it is "a tool of statutory interpretation." *Id.* It may have been unwise for Congress to allow taxpayers to pay reduced taxes, and pay out dividends, "through a structure that might otherwise run afoul of the Code." *Id.* at 518. But it is not our role to save the Commissioner from the inescapable logical consequence of what Congress has plainly authorized. Accordingly, to the extent that it was adverse to the Mazzeis, the judgment of the Tax Court is reversed.

**REVERSED.**